Caruthers **ALEXANDER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 68941.**

Court of Criminal Appeals of Texas, En Banc.

Oct. 7, 1987.

---

750

Yale G. Phillips, David R. Weiner, San Antonio, for appellant.

Sam D. Millsap, Jr., Dist. Atty., and Sharon MacRae, Raymond Anglini, Julie B. Pollock and Barbara Hervey, Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This appeal is taken from a conviction for capital murder. V.T.C.A., Penal Code, § 19.03(a)(2). The death penalty was assessed by the court after the jury returned affirmative findings to both special issues submitted pursuant to Article 37.071(b)(1) and (2), V.A.C.C.P.

Appellant raises sixteen points of error, one of which alleges there was insufficient evidence to support the jury's verdict of guilty. Two separate points of error particularly allege the evidence was insufficient to show that murder was committed in the course of committing or attempting to commit aggravated rape and that a probability exists that appellant would commit criminal acts of violence in the future. We overrule appellant's points of error as to the sufficiency of the evidence but must reverse the conviction because the trial court permitted the State over objection to improperly impeach the appellant as a witness in his own behalf.

The indictment alleged that appellant on or about April 23, 1981, "did then and there intentionally and knowingly cause the death of an individual, namely: LORI BRUCH, hereinafter called complainant, by STRANGLING THE SAID LORI BRUCH WITH A LIGATURE, and the said defendant did then and there intentionally cause the death of the said complainant while in the course of committing and attempting to commit the offense of AGGRAVATED RAPE ON THE SAID COMPLAINANT; against the peace and dignity of the State."

The testimony at trial showed that Lori Bruch left her house around 6:15 p.m. on April 22, 1981, to drive to the Wrangler Club where she worked as a waitress. Lori's husband, Marvin, testified that she usually worked from 6:30 p.m. to 3:00 a.m.

When Marvin awoke around 5:15 a.m. on April 23, he discovered that Lori had not returned home. Consequently, he called various co-workers, hospitals, and the police to determine Lori's whereabouts. Marvin woke his son and drove the route Lori normally took to work, stopping at Jojo's Restaurant to ask whether Lori had gone there after work. After inquiring at Northeast Hospital, Marvin returned home after 7:00 a.m. and called the police just before 8:00 a.m. to report Lori as missing. Fifteen or twenty minutes later Marvin received a call from the police asking him to come to the morgue to identify a body. Marvin identified the body as that of his wife, Lori.

Ricardo Solis, one of Lori's co-workers, testified that the Wrangler Club closed at 2:00 a.m. on April 23 and that it took the employees about an hour to clean up. Solis and Lori then drove separately to Jim's Coffee Shop and ate breakfast until about 4:00 a.m. Solis testified that it was common for Wrangler Club employees to get together after work for breakfast or for a party at someone's house. After breakfast, Solis walked Lori to her car, a 1980 brown Honda Accord, and then spoke with another employee from the Wrangler. Solis stated that by the time he turned around Lori had driven off. Solis received a call from Lori's husband around 5:30 a.m. asking whether he knew of Lori's whereabouts. Solis told Marvin that he and Lori had eaten breakfast together and that Lori had left the restaurant around 4:00 a.m.

Lori's Honda Accord was discovered by Alfred Lomas, an employee at Kelly Air Force Base, on Culebra Road around 4:30 a.m. on April 23, as Lomas was driving to work. Lomas testified that it was raining very hard that morning and that he saw a brown Honda automobile blocking the road at a low water crossing. Lomas did not see anyone inside the car and decided to drive back to a Seven–Eleven convenience store to report the matter. Lomas also stated that he did not notice any damage to the vehicle and that the lights were turned off.

Patrolman Raymond Sanchez responded to a call about an abandoned vehicle on Culebra Road. According to Sanchez the call was broadcast around 4:30 a.m. and he arrived at the scene approximately seventeen minutes later. At this time it was still raining very heavily. Upon arriving, Sanchez found a brown 1980 Honda two door vehicle parked on the wrong side of the road facing north. The car was unlocked and unoccupied, with no keys in the ignition, and the windows were rolled down. Inside the car, Sanchez found a ladies handbag, a couple of ladies accessories on the front seat and a lady's cowboy hat. Sanchez also noticed that the right rear bumper had been damaged and that the right rear tail light was broken. A wrecker arrived at approximately 5:30 a.m. to remove the vehicle.

Gilbert Tovares, a Brother in the Catholic Church, left the monastery of the Carmelite Fathers on Kentucky Street around 6:20 a.m. on April 23 to pick up Alberta Simmons, who worked as a cook for the monastery. After picking her up, Tovares drove back to the monastery and noticed a large white van parked on Kentucky Street facing east. Tovares recalled seeing blue writing on the side of the van, and testified that the first word started with the letter "A" and that the second word was "medical." The van also had a slanted windshield. Tovares identified three photographs of an "Abbey Medical" white Chevrolet van as being similar to the one he had seen on April 23.

As Tovares drove past the van to pull into the driveway of the monastery, he noticed the silhouette of a person behind the seats in the carrier portion of the van "from the light coming in through the back windows of the van." Brother Tovares could not tell whether the figure was a man or a woman. He later gave a statement to the police about the incident.

Alberta Simmons corroborated Brother Tovares' testimony and added that the top line of blue lettering started with "A–B" and that the "bottom line said medical." State's Exhibits 15, 16, and 17 depicted a white Chevrolet van with "Abbey Medical"

printed on the side in blue capital letters. Alberta identified the three photographs as being similar to the van she had seen parked in front of the monastery. Five minutes after Alberta had entered the kitchen she noticed "a lot of police cars" around the same area where she had seen the van, and notified Brother Tovares. Alberta stated that she had not seen anyone in the van, and that she also gave a statement to the police.

Lori Bruch's body was discovered by Roy Garcia, a head custodian at Paul Nelson Elementary School, located near the monastery. Garcia, who opened the school every morning, testified that two children came up to him on the school grounds and said they had seen a lady lying in the street. Garcia discovered the body on Kentucky Street around 6:45 a.m. on April 23 and testified, "she was lying on her left side on the street, close to the curb. The water was flowing around her. She was naked. She had a rag gagged in her mouth." The deceased also had a rope around her neck, ankles and wrists. Garcia went back to the school to call the police and brought two rain coats to cover the body. He then went to a fire station around the corner to call the EMS.

Mike Ritchey, a detective with the San Antonio Police Department, arrived at the location around 7:15 a.m. and started processing the scene by taking pictures and making a diagram. Ritchey testified that EMS had tried to revive the victim but failed. He stated that the body had a rope around the neck, the hands were tied in front and the feet were tied. A further search of the area for evidence proved unsuccessful. At the medical examiner's office Ritchey received an envelope containing various personal property of the victim, including a plain wedding band, an engagement ring, a gold earring with a bluish colored heart on it, and another gold ring with a heart shaped diagram on the front. These items were taken to the police department property room. Ritchey further testified that due to the wet conditions that morning no fingerprints could be lifted from the scene.

Dr. Vincent DiMaio, Chief Medical Examiner for Bexar County, performed an autopsy on Lori Bruch at 9:00 a.m. on April 23. Dr. DiMaio's external examination of the body revealed a gag stuffed into the victim's mouth and tied around the lower half of the mouth. The deceased's wrists and ankles were bound, and there were marks on the skin indicating the victim was alive at the time she had been tied up. A piece of rope approximately 25 inches in length encircled the neck and there were marks on the neck due to the tightening of the rope. In addition to the ligature marks on the neck, there was a small slit-like stab wound on the right side of the neck, causing a small amount of hemorrhaging in the underlying soft tissue. The only other injury to the body was a scratch one-half inch in length running back from the outer corner of the victim's right eye. Dr. DiMaio testified the ligature or cord was tightened on the back of the neck rather than the front or the sides, and that the small hemorrhages all over the face were characteristic of a strangulation death.

Dr. DiMaio also took cotton swabs of the rectum, mouth and vagina, revealing large numbers of sperm in the vagina. The victim's pubic hair was combed, and the combings were placed into an envelope which was sealed and turned over to the city crime lab. As a result of the autopsy, the doctor's opinion was that death was caused by ligature strangulation, with the assailant positioned behind the victim. Such strangulation cuts off the blood flow to the brain, causing the victim to pass out in ten to fifteen seconds. If the pressure is maintained, death occurs about a minute and a half later.

Dr. DiMaio testified that the large numbers of sperm in the vagina indicated that sexual intercourse had taken place within two or three hours prior to death. With respect to the stab wound on the victim's neck, DiMaio stated that the wound was inflicted while the heart was still beating and while some circulation of blood was present. The victim's blood type was type O blood.

John Quill, a special agent of the FBI assigned to the laboratory division in Washington, D.C., testified that he specialized in the microscopic and microchemical examination of hairs, fibers and related materials. Quill examined several hair samples, including a head hair sample from Lori Bruch, a pubic hair sample from appellant, a head hair sample from appellant, pubic hair combings from Lori Bruch, and various hairs taken from the vehicle. Quill's examination of the victim's pubic hair combings revealed a black hair fragment of Negroid origin, however, this sample was too small to be of value for comparison purposes. Also present was a pubic hair of Caucasian origin with the same microscopic characteristics as the victim's hair. Brown head hairs of Caucasian origin were also found in the van that were microscopically dissimilar to the victim's hair.

John Campa, a member of the San Antonio Police Department Homicide Bureau, investigated the homicide of Lori Bruch along with his partner Detective Anton Michalec. After taking the statements of Brother Tovares and Alberta Simmons, Campa and Michalec proceeded to the location of the victim's automobile to check for possible evidence. From speaking to the witnesses at the scene the officers concluded that a white van may have been involved in the murder. Officer Campa then checked the telephone directory for medical companies starting with the letter "A." He came up with a list of eight companies, including Abbey Medical. Campa investigated Abbey Medical and discovered that company owned a white van. A close inspection of the van revealed that the left front bumper had several scratch marks and some brown paint on it. The brown paint on the van seemed to match the color of the victim's car, which had sustained damage to the right rear above the bumper area. Campa's investigation of the other medical companies revealed that none of them owned vans, only pickup trucks and cars.

Milbern Wood, branch manager for Abbey Medical, testified that appellant started to work for Abbey Medical as a driver in

September or October of 1980, and was still employed there in April, 1981. Abbey Medical owned two delivery vans, one white and one blue, and appellant was assigned to the white van with blue lettering on it.

On April 24, 1981, Wood arrived at work around 8:20 a.m. and saw assistant branch manager Rick Meyer and two San Antonio police officers standing in the parking lot of Abbey Medical. The men waited for appellant, who came to work at 9:00 a.m. that morning. The officers asked appellant whether he knew about the scratches on the bumper of the van, and appellant replied "no." Appellant was asked where the van was on the night of April 22 and the early morning hours of April 23, and appellant answered that he had taken it home that night. According to Wood, appellant stated that he had not lent the van to anyone.

Wood testified there were two sets of keys for the white van, one set assigned to the driver and another set that stayed on the dispatcher's desk. Wood stated that appellant was the only black person ever employed by Abbey Medical.

Tanislado Gonzales, a dispatcher for Abbey Medical, testified that appellant drove a white van with "Abbey Medical" on the side, while Andy Casanova, another employee, drove a blue van with no markings. He stated that it would not be unusual for a driver to take a van home at night if he had a late delivery to make. Gonzales left work on April 22 at 5:30 p.m. and stated that appellant had not returned the van by that time. However, on April 23 appellant and the van were back at work. On cross-examination Gonzales testified that appellant had once complained about someone getting into the van at night, but he could not recall when the incident had occurred. According to Gonzales, appellant worked for "Abbey Party," a business associated with Abbey Medical, on April 23 setting up chairs for a parade the next day.

Detective Mike Trainer processed the Abbey Medical van on April 24 at the San Antonio crime lab. Trainer testified the van was photographed, searched for physical evidence and processed for latent fingerprints. Inside the van Trainer found a gold earring with a blue stone, a blood spot in front of the right rear wheel well, moving blankets, a rope sample, one tissue, two hair samples, a sack containing seventy-four pennies, five .38 special Smith and Wesson live rounds, a sales receipt from Imperial Loan and Jewelry Company for a .38 special Titan Revolver in the amount of $119.95 made out to appellant, one small brown leather weave belt, and a mens brown leather belt. Trainer also took a paint sample from the left front bumper of the van and lifted thirteen latent fingerprints from almost every portion of the van.

San Antonio Police Officer John Rivas processed the 1980 Honda Accord on April 23. Rivas took paint samples from both the damaged and undamaged areas on the right rear of the Honda, picked up loose items inside the vehicle and removed the damaged right rear tail light lens. Rivas inventoried the contents of the vehicle, and found latent fingerprints on several items of personal property, as well as the interior and exterior of the car doors and windows. Rivas testified that he was not qualified to identify any of the prints, because he was trained only to lift and develop fingerprints.

Joe Castorena, a forensic toxicologist, examined several paint chip samples taken from the van and the Honda Accord, and concluded that the brown streaks on the white van could have had a common origin. Further analysis indicated the paints were identical, although Castorena admitted his conclusion about the origin of the paints could not be absolute. Soil samples taken from appellant's shoes did not have a common origin with soil samples taken from the scene at Culebra and Grissom Roads. It was shown to have been raining when the Honda was found and no showing it had been off the pavement.

Police Officer Cruz Morua, a fingerprint expert, testified that appellant's fingerprints did not match any of the legible latent prints lifted from the Honda. The latent prints taken from inside the white

van indicated that three prints were identified as belonging to appellant, while the other legible prints were left by someone other than appellant and the deceased. Morua did not find any of the unknown legible prints to appear in both vehicles.

Jane Nellis, a serologist in the San Antonio Police Department crime lab, testified that she examined various items taken from the van, the Honda, appellant, and the deceased. A blood sample obtained from the medical examiner's office revealed that the victim's blood type was "ABO type O." An examination of the moving pads taken from the van revealed that the blood on one of the pads was "exactly consistent" with the victim's blood and enzyme type. Nellis testified that when factoring the victim's blood type with her specific enzymes, only one percent of the population would share the same characteristics.

Nellis tested head and pubic hair samples taken from appellant to run a phosphoglucomutase enzyme test, and discovered that appellant had a "P–G–M type one." This result was compared to a PGM test run on the semen stains found on one of the pads, revealing that the stains were also PGM type one.[1] The blood stain on the floor of the van turned out to be ABO type O and consistent with the victim's blood type. Further enzyme tests on the blood sample proved inconclusive.

An examination of the pubic hair combings taken from the deceased revealed on dissimilar hair that was black and very curly. The hair samples were mounted on three by five index cards and later sent to the FBI for further examination. Nellis also testified that the rope samples taken from the deceased's body did not match the rope found in the van.

Marvin Bruch, the victim's husband, was recalled by the State to identify a white leather billfold found in the Honda, the small leather belt found in the van, an earring, the jewelry and earring also found in the van as belonging to his wife, Lori. He also testified that it had been at least two or three days since he and Lori had sex prior to April 22, 1981.

Police Officer Anton Michalec, who helped conduct the murder investigation at Abbey Medical with Detective James Herring, testified that appellant "had a look of shock on his face, almost an agonizing look of shock on his face," on the morning of April 23 when the officers told him about their investigation. Appellant was told the officers would like to talk to him at the police station, but that he was not under arrest. Before driving the van to the car pound, Michalec checked to see whether it was hot wired and discovered that it was not. Michalec then took appellant's keys and drove the van to the pound to be processed. Appellant was arrested by Officer Michalec after an earring was found in the van matching the one found on the victim.

Michalec also measured the bumpers of the damaged Honda Accord and the white van. He discovered that the van's bumper was eighteen and one half inches from the ground, corresponding to the damage sustained by the Honda at approximately the same level. Michalec confirmed that the other vans and trucks owned by Abbey Medical and Abbey Party did not match the description of the white van observed at the scene. Michalec also testified that appellant's father lived on Roberts Street located about five to seven blocks from where the body was found. The State rested at the conclusion of Michalec's testimony.

Before calling its first witness, the defense reurged its motion to suppress any oral statements made by appellant and moved for an instructed verdict based on the sufficiency of the evidence to support a finding of guilty. Both motions were overruled.

The defense initially called three witnesses to testify that appellant's reputation for being a peaceful and law-abiding citizen was good. Then, Connie Louise Clark, appellant's common-law wife, testified that she had lived with appellant for seven

---

1. On cross-examination Nellis testified that PGM type one is found in 66.2% of the black population and 58.9% of the white population.

years. She testified that appellant supported her and her two daughters by another marriage, as well as paying the rent.

On Wednesday, April 22, Clark worked at Shilo's Delicatessen, returning home around 7:00 p.m. Appellant came home at 9:45 p.m. that same evening, driving the Abbey Medical van. Clark and appellant argued for a short time and then appellant walked down the street. When appellant returned the argument resumed, and according to Clark appellant "was tired of listening to me arguing and he just went on in the bedroom."

Clark stated that the Abbey van remained parked outside when appellant left the apartment to take his walk and also when he returned. She testified that there was frequently a lot of music and activity outside the apartment, and that it was raining on the night of April 22, so the windows were shut and two electric fans were turned on in the bedroom. Clark recalled that she had to go to the bathroom three times that night, and that appellant was in bed each time she awoke. Appellant was still in bed when the alarm went off at 6:30 a.m.

Clark testified that at 7:30 a.m. appellant drove her children and her niece to school in the Abbey van. At no time during the previous night had she looked out the window to see if the van was still parked outside and she did not know if anyone had taken the van and brought it back.

Clark also testified that appellant worked late on Thursday night, April 23, setting up chairs for a parade. According to Clark he came home, took a bath, and went to bed.[2] Clark further noted that her brother, Avery, had access to appellant's key ring, which included the key to the van, and that Avery sometimes used appellant's car.

Appellant took the stand and testified that he was a driver for Abbey Medical, and that he had been issued a set of keys to the white van. He recalled that the week of his arrest was Fiesta Week in San Antonio, and that he had seen "three, maybe four" black casual employees working for Abbey Party.

On Wednesday, April 22 appellant finished his last delivery by 4:30 p.m. and went to wash the white van at a local car wash. Appellant stated that he ran out of money and drove home between 5:30 and 6:00 p.m. to pick up some more money. He then drove to another car wash to finish cleaning the van. From the second car wash appellant proceeded to the Blue Haven lounge where he drank a beer. On the way home he bought a six-pack of beer at a Stop–N–Go.

Appellant testified his wife Connie was home, and that she started arguing with him about money matters. Appellant left the apartment to avoid the argument and walked to an abandoned club, where he sat on a step for about thirty minutes. According to the appellant, he had driven the van home and had parked it on the lawn in front of the apartment living room. It was still parked there when he returned from his walk. Appellant stated that he had locked the van that evening "to the best of [his] knowledge."

Upon arriving home appellant had a beer, spoke with Connie, and then went "straight to bed." He stated that he did not get up at any time during the night, and that he did not leave the house. Appellant also noted the shades and windows were pulled down in the apartment.

The next morning, April 23, appellant got himself ready for work without ever looking outside to see whether the van was still parked out front. Appellant took Connie's daughters, a niece, and a neighbor's boy to school that morning before driving to work. He recalled unlocking the back door and the passenger door of the van, but did not remember if the door on the driver's side was locked. After working a full day for Abbey Medical, appellant went downtown to help Abbey Party set up chairs for the

---

2. Clark noted on cross examination that appellant came home around 7:30 p.m. "to check on" her, before going back to work.

Fiesta.[3] One of the employees took appellant home that night in one of the Abbey Party trucks. According to appellant, the white van was left at Abbey Medical that evening.

On Friday, April 24, appellant took a bus to work and was met by two detectives. The detectives introduced themselves and asked whether he had taken the van home the night before last. Appellant answered that he had. Detective Michalec informed appellant that the van had been seen in the vicinity where a body was found. Appellant answered "no" when asked if it was possible that someone had taken the van without his knowledge. Appellant voluntarily accompanied the detectives to the downtown police station. At the conclusion of appellant's testimony the defense rested.

The State called four rebuttal witnesses. Genevieve Guerrero, principal of John J. Pershing Elementary School, testified that the school's attendance records for April 23, 1981, revealed that Angela and Makeba Clark, as well as Roshila Charles, were absent on that date. Guerrero explained that every teacher had until 10:30 a.m. to take roll, and admitted that if a child left school before 10:30 a.m. he or she would be marked absent for the day.

Detective James Herring testified that he and Detective Michalec drove to the Sutton Homes on April 25, 1981,[4] to speak to Connie Clark about the appellant's whereabouts on the night of the murder. She told the detectives that on the evening of April 22 appellant came home around 10:00 p.m., stayed for about ten minutes, drank some beer, and then left. Connie said she saw appellant for a short period and then did not see him again.

Detective Michalec corroborated Herring's testimony, adding that Connie had told the detectives that appellant left to help set up chairs for the parade on the night of April 23.

Finally, Ruben Solis, a former truck driver for Abbey Party,[5] testified that he and appellant worked the night of April 23 setting up chairs. However, appellant did not work the night of April 22. Solis stated that even though Abbey Party had hired black casual employees in the past, none were hired during Fiesta week when the murder occurred.

Appellant's initial ground of error challenges the sufficiency of the evidence to support the jury's verdict of guilty. Appellant contends no circumstantial or direct evidence was offered to prove that he was in the white van or that he was not in his apartment during the early morning hours of April 23, 1981. It is argued that the evidence was in fact to the contrary, i.e., that appellant remained at home between 10:00 p.m. on April 22 and 7:30 a.m. on April 23.

The standard for reviewing the sufficiency of the evidence on appeal is the same for direct and circumstantial evidence cases. *Fierro v. State*, 706 S.W.2d 310, 313 (Tex. Cr.App.1986); *Anderson v. State*, 701 S.W. 2d 868, 872 (Tex.Cr.App.1985); *Brandley v. State*, 691 S.W.2d 699, 703 (Tex.Cr.App. 1985); *Garrett v. State*, 682 S.W.2d 301, 304 (Tex.Cr.App.1984); *Carlsen v. State*, 654 S.W.2d 444, 449 (Tex.Cr.App.1983) (Opinion on Rehearing). The evidence must be viewed in the light most favorable to the verdict, and the standard is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Fierro*, supra; *Brandley*, supra; *Jackson v. State*, 672 S.W.2d 801, 803 (Tex. Cr.App.1984); *Jayroe v. State*, 707 S.W.2d 652, 653 (Tex.App.–Texarkana 1986, PDR refused); *Hamilton v. State*, 699 S.W.2d 576, 577 (Tex.App.–Texarkana 1985, no writ). "If the State's evidence supports an inference other than a finding of the essential elements of the crime, then no trier of

---

**3.** Appellant corroborated Connie's statement that he stopped by the apartment that evening. Appellant testified that he came through on his last route, brought a six-pack to Connie, and told her he would be working late that night.

**4.** Detective Michalec, who accompanied Herring that day, testified the date was April 24, 1981.

**5.** Solis referred to the company as "Abbey Rents."

fact could *rationally* find the accused guilty *beyond a reasonable doubt*—and this is true irrespective of the character of the evidence." *Carlsen*, supra, at 449–50.

Appellant contends that a conviction on circumstantial evidence cannot be sustained unless the circumstances exclude to a moral certainty every other reasonable hypothesis except the guilt of the accused. (Emphasis supplied.) However, this Court has also held:

> "It is not required that the circumstances should, to a moral certainty, actually exclude every hypothesis that the act may have been committed by another person, but that the hypothesis is a reasonable one consistent with the circumstances and the facts proved. (Citations omitted) Each fact need not point directly and independently to the guilt of the accused, as the cumulative effect of all the incriminating facts may be sufficient to support the evidence. (Citations omitted) However, proof which amounts only to a strong suspicion or mere probability is insufficient." (Citations omitted) *Carlsen v. State*, 654 S.W.2d 444, 447 (Tex. Cr.App.1983).

See also *Brandley*, supra; *Moore v. State*, 640 S.W.2d 300, 302 (Tex.Cr.App.1982); *Autry v. State*, 626 S.W.2d 758, 761 (Tex. Cr.App.1982); *Swink v. State*, 617 S.W.2d 203, 207 (Tex.Cr.App.1981), *cert denied*, 454 U.S. 1087, 102 S.Ct. 648, 70 L.Ed.2d 624 (1981); *Schershel v. State*, 575 S.W.2d 548, 550 (Tex.Cr.App.1979); *Stogsdill v. State*, 552 S.W.2d 481, 486 (Tex.Cr.App.1977); *Flores v. State*, 551 S.W.2d 364, 367 (Tex. Cr.App.1977); *Marmon v. State*, 704 S.W. 2d 90, 92 (Tex.App.–Dallas 1985, PDR refused). "It is enough if the conclusion [of guilt] is warranted by the combined and cumulative force of all the incriminating circumstances." *Russell v. State*, 665 S.W. 2d 771, 776 (Tex.Cr.App.1983), *cert. denied*, 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984); see also *O'Pry v. State*, 642 S.W.2d 748, 760 (Tex.Cr.App.1982) (Opinion on Rehearing); *Flores*, supra, at 367; *Jones v. State*, 442 S.W.2d 698 (Tex.Cr. App.1969), *cert. denied*, 397 U.S. 958, 90 S.Ct. 967, 25 L.Ed.2d 143 (1970).

■ Viewing the evidence in the light most favorable to the jury's verdict we find:

(1) Lori Bruch, the deceased, left her home in northwest Bexar County at approximately 6:15 p.m. on April 22, 1981, to work at the Wrangler Club. She was driving her Honda automobile. It was shown not to be damaged at that time.

(2) Lori Bruch left work at approximately 3:00 a.m. on April 23rd and went to Jim's Coffee Shop on Loop 410 and Perrin Beitel Road in the northeast part of Bexar County. She had breakfast with Ricardo Solis, a co-worker. Other employees of the Wrangler Club were there.

(3) Lori left Jim's Coffee Shop at approximately 4:00 a.m. driving her Honda, on which no damage was observed.

(4) Between 4:20 and 4:27 a.m., Lori's Honda was found abandoned on Culebra Road south of Grissom Road in the northwest section of Bexar County, approximately a mile or mile and a half from her home. The right rear of the Honda was damaged and there were other paint marks on it.

(5) At approximately 6:30 a.m. Brother Gilbert Tovares and Alberta Simmons observed a white van parked near the entrance to the monastery of the Carmelite Fathers located at 906 Kentucky Street in San Antonio. The white van had blue lettering on the side, the first line starting with "AB" and the second line being "Medic" or "Medical." Brother Tovares saw a "silhouette" of a person behind the seats of the van in the carrier portion.

(6) At about 6:50 p.m. the body of Lori Bruch was found in the same area where the white van was seen in the 900 block of Kentucky, approximately five blocks from the home of appellant's father. The body was nude with a rope around the neck.

(7) The autopsy conducted on Lori Bruch, a white female, age 19, revealed the cause of death was ligature strangulation. The condition of the sperm found in her vagina indicated sexual intercourse two to four hours prior to the autopsy at 9:00 a.m. on April 23rd. Lori's husband testified

that they had not had sexual relations for two or three days prior to her death. He identified the body and the one earring she was wearing at the time her body was found.

(8) A combing of the pubic area of Lori Bruch's body revealed a hair fragment identified as Negroid in origin. Appellant was shown to be a black man.

(9) The appellant Alexander was shown to have left work on April 22, 1981, and drove a white Chevrolet company van home. It bore the lettering Abbey Medical on the side of the van. The company's only other van was blue.

(10) Appellant and his common-law wife testified he was at home and in bed at the time of the homicide. The wife's testimony was sought to be impeached by showing that earlier she had made a statement that appellant left the house around 10:00 p.m. on April 22nd and she did not see him the rest of the evening.

(11) Appellant and his wife testified that he had taken her children and a niece to school in the van about 7:30 a.m. on April 23rd. School records indicate the children did not attend that day.

(12) Appellant returned to work on April 23rd between 8:00 and 8:30 a.m.

(13) Detective Campa at 12:15 a.m. April 24th, spotted a van parked at Abbey Medical with damage to the left front bumper.

(14) Later on the morning of April 24th Detectives Michalec and Herring impounded the van which had been driven by the appellant. There was no evidence the van had been "hotwired." One set of keys was in the possession of the appellant a second set was on the dispatcher's desk at Abbey Medical. Appellant told the officers he had the van at home on the night of April 22nd, in response to the question of Mr. Wood (Manager of Abbey Medical) that it was not possible that someone could have used it. Paint samples were taken from the damaged areas of both the Honda and the van. The brown paint sample from the Honda matched the brown paint sample taken from the damaged area of the white van.

The distance from the ground to the area damaged was the same on both vehicles.

(15) Among the items found in the van were a sales receipt from a .38 Special Titan Tiger from Imperial Loan dated January 22, 1982, plus five live cartridges, an earring with a blue stone, a small brown braided belt, a moving pad with blood and seminal stains, and a blood stain on the floor of the van.

(16) The belt and earring found in the van were identified as belonging to the deceased, Lori Bruch. The earring matched the one found on her nude body.

(17) The blood found on the moving pad and on the floor of the van matched Lori Bruch's ABO blood type O.

(18) The seminal stain found on the moving pad along with the said blood stain was typed as PGM type 1. Appellant is PGM type 1.

The State argues that the evidence excludes every other reasonable hypothesis except that of the appellant's guilt of murder. We agree. See and cf. the facts and the holdings in *Brandley v. State*, 691 S.W.2d 699 (Tex.Cr.App.1985), and *Russell v. State*, 665 S.W.2d 771 (Tex.Cr.App.1983), cert. den., 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984). The point of error is overruled.

Appellant, in a related contention, contends the evidence is sufficient to support a finding beyond a reasonable doubt that the murder was committed in the course of committing or attempting to commit aggravated rape.

█ Appellant argues that this is a circumstantial evidence case, and that the evidence does not exclude the reasonable hypothesis that the act of sexual intercourse or attempt to have intercourse did not take place while the deceased was still alive, in which event there would be no rape or attempted rape, much less aggravated rape. On the other hand he urges that the evidence is sufficient to support a finding that a rape, if any, of the deceased was an aggravated rape as alleged.

V.T.C.A., Penal Code, § 19.03(a)(2), provides:

"(a) A person commits an offense if he commits murder as defined under section 19.02(a)(1) of this code and:

"(1) * * *

"(2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated rape or arson; ..."

V.T.C.A., Penal Code, § 21.03, in effect at the time of the alleged offense, provided in part that rape became aggravated if the actor

"(1) causes serious bodily injury or attempts to cause death to the victim or another in the course of the same criminal episode."

Appellant points out that under said § 19.03 rape alone, unlike robbery, kidnapping, etc., will not elevate an intentional murder to capital murder, but that it must be *aggravated* rape. And that the phrase "in course of" used in § 19.03(a)(2) means an intentional murder "occurring in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of the offense." *Riles v. State*, 595 S.W.2d 858, 862 (Tex.Cr.App. 1980); *Autry v. State*, 626 S.W.2d 758, 762 (Tex.Cr.App.1982), *cert. denied*, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982). Appellant contends the "offense" alleged is aggravated rape.

As to his first contention appellant calls attention to the fact the medical examiner testified as to the presence of sperm in the vagina of the deceased, and indicated in his opinion the intercourse had taken place up to three hours before death, at the time of death or immediately after death. There was no evidence of forced entry of or trauma to the deceased's vagina. Appellant argues that if in fact the intercourse did take place after death the evidence would be insufficient to show murder in the course of rape or attempted rape much less in the course of an aggravated rape or attempted aggravated rape.

The State argues that the hypothesis that appellant's only motive was to commit murder of someone with whom there was no showing of any previous contact and that only as an afterthought he decided to have intercourse with a dead body is totally unreasonable. The State agrees that most of the evidence is circumstantial, but there was direct evidence of the intercourse, that evidence reflects the deceased was forcibly abducted from her car, that she was bound and gagged while still alive, that a stab wound was inflicted on her neck while she was still alive, and there was evidence of a struggle. The evidence, the State contends, supports the jury's verdict.

In connection with his second contention appellant argues "the act constituting the murder will not necessarily satisfy the requirement that the rape or attempted rape under § 19.03(a)(2) be aggravated. This would be particularly true in a case where the evidence strongly suggests that murder was committed 'in immediate flight *after* the attempt or commission' of aggravated rape. To find that a murder was committed in immediate flight *after* the commission of aggravated rape means that the conduct aggravating the rape preceded the murder. Appellant submits that the instant case is just such a case, and that in any event, the evidence offered is insufficient to show that an aggravated rape or attempted aggravated rape was committed against the deceased."

The State argues that the act of murder, when occurring in the course of the same criminal episode as the rape, and on the same victim, necessarily satisfies the requirement that the rape be aggravated citing generally *Perez v. State*, 608 S.W.2d 634, 635 (Tex.Cr.App.1980). The State notes that rape and murder in the instant case occurred in the course of the same criminal episode and on the same victim. There was direct evidence of sexual intercourse and circumstantially revealed the lack of consent. Serious bodily injury causing death was inflicted, and the evidence was sufficient to show an aggravated rape. In addition the State would argue that the evidence, excluding the murder itself, showed an aggravated rape.

The jury is the trier of the facts, the judge of the credibility of the witnesses, and the weight to be given to the evidence.

Viewing the evidence in the light most favorable to the verdict in this circumstantial evidence case and using the "rational trier of fact" standard, see *Carlsen v. State*, 654 S.W.2d 444, 449–450 (Tex.Cr. App.1983) (Opinion on rehearing), we conclude that the evidence is sufficient beyond a reasonable doubt to show that the murder was committed in the course of committing or attempting to commit aggravated rape.

The point of error is overruled.

Appellant further claims that the evidence is insufficient to support an affirmative finding to the issue of future dangerousness, the second special issue submitted at the penalty stage of the trial. See Article 37.071(b)(2).

At the penalty stage of the trial the pen packets were introduced reflecting appellant's prior convictions for arson and involuntary manslaughter, along with fingerprint expert testimony identifying appellant as the person so previously convicted. There was no other State's evidence offered nor did the appellant offer evidence at the penalty stage of the trial.

■ It is well settled that in assessing punishment the jury may consider all of the evidence adduced at the guilt stage of the trial. *Russell v. State*, 598 S.W.2d 238, 254 (Tex.Cr.App.1980); *Bravo v. State*, 627 S.W.2d 152, 158 (Tex.Cr.App.1982). See *Demouchette v. State*, 591 S.W.2d 488, 491 (Tex.Cr.App.1979), *cert. den.* 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981); *Duffy v. State*, 567 S.W.2d 197, 208 (Tex.Cr. App.1978), *cert. den.* 439 U.S. 991, 99 S.Ct. 593, 58 L.Ed.2d 666 (1978). It has been said that the circumstances of the offense and the facts surrounding it may furnish greater probative evidence than any other evidence regarding the probability of future acts of violence. *Bravo v. State*, supra; *Duffy v. State*, supra; *Garcia v. State*, 626 S.W.2d 46, 51 (Tex.Cr.App.1981); *Fierro v. State*, 706 S.W.2d 310 (Tex.Cr. App.1986). See also *Mitchell v. State*, 650 S.W.2d 801 (Tex.Cr.App.1983); *Hawkins v. State*, 660 S.W.2d 65 (Tex.Cr.App.1983); *Smith v. State*, 676 S.W.2d 379 (Tex.Cr. App.1984); *Smith v. State*, 683 S.W.2d 393 (Tex.Cr.App.1984). In some instances the facts of the offense itself will support an affirmative finding to the special issue under Article 37.071, supra, that of future dangerousness. *Santana v. State*, 714 S.W.2d 1 (Tex.Cr.App.1986). Each case, of course, must be decided on its own facts. *Cannon v. State*, 691 S.W.2d 664 (Tex.Cr. App.1985); *Santana v. State*, supra.

■ Here there was evidence of two prior felony convictions, one for arson and one for involuntary manslaughter, and in addition there were the facts elicited at the guilt stage of the trial. We need not repeat the brutal facts again. We conclude that, viewing the evidence in the light most favorable to the affirmative finding by the jury to the issue of future dangerousness, and applying the "rational trier of fact" test, the evidence was sufficient to support the jury's answer beyond a reasonable doubt.

The point of error is overruled.

In another point of error appellant claims the "trial court committed reversible error by allowing the prosecutor to introduce evidence of an extraneous offense and extraneous misconduct committed by appellant, wherein appellant made a false statement in connection with the purchase of a gun." Appellant urges that while testifying he was improperly impeached by a specific act of misconduct that had not resulted in a charge or conviction, and which was immaterial to any issue in the case.

At the guilt stage of the trial the appellant took the stand in his own behalf. On cross-examination in order to impeach him the State established that appellant had been convicted of arson in 1972 and of involuntary manslaughter in 1975. Appellant contended he had no recollection of a confession or statement given in connection with the arson charge, claiming he was in the hospital at the time. In connection with the involuntary conviction, appellant stated he "pleaded guilty to accidental death." The record then reflects:

"Q. All right. Now, of course, Mr. Alexander you are not the sort of person who would lie, are you?

"A. I try not to be.

"Q. All right. Certainly you wouldn't come in here and try to mislead this jury, would you?

"A. No, ma'am; I wouldn't.

"Q. And certainly on something that is so important and under penalty of law you wouldn't tell a fib, would you?

"A. I wouldn't say that, but in this case I am not.

"Q. In this case you are not?

"A. That is right.

"Q. All right, then why is it, Mr. Alexander, that when you went and bought your pistol from the Imperial Loan Company you saw fit to respond no to the question...."

The question was interrupted with an extraneous offense objection. The jury was removed. Appellant objected that the question was in violation of the motion in limine, and that to permit the question to be answered would show an extraneous offense and a "specific act of misconduct." The State responded that it was "not introducing this, Judge, to show any type of extraneous offense. I am introducing it to show—on credibility—for the purposes of credibility." The defense objection was then overruled.

In the presence of the jury the State then asked the appellant:

"Q. All right. My question to you Mr. Alexander, is why is it that when you purchased your pistol from the Imperi-al Loan and Jewelry Company that you responded no to the question, have you been convicted in any court of a crime punishable by imprisonment for a term exceeding one year?

"A. Because I knew if I said otherwise, I wouldn't be able to purchase it.

"Q. All right. So, you told them a lie, isn't that true?

"A. In the matter of the seriousness of the reason I needed it; yes, ma'am.

"Q. But you told them a lie?

"A. Yes, ma'am.

"Q. Because you knew that if you told them the truth you wouldn't get what you wanted, which was the pistol?

"A. Yes, ma'am.

"Q. All right. But, of course, you certainly wouldn't tell the jury a lie just so that you wouldn't be convicted of this crime?

"A. I am telling the jury the truth. I said that in order to protect my family, which needed that pistol at that time. This is altogether a different situation."

On redirect examination appellant stated that he had bought the gun because his "family had been broken in on" while he was out of town, but he no longer had the gun as it had been taken out of his car "this side of Kerr County."

■ The rule against the admission of extraneous offenses is well known [6] and furnishes a backdrop for the claim present-

**6.** In *Young v. State,* 261 S.W.2d 836, 837 (1953), this Court, speaking through Judge Morrison, said:

"The general rule in all English speaking jurisdictions is that an accused is entitled to be tried on the accusation made in the State's pleading and not on some collateral crime, or for being a criminal generally. The rule is now deemed axiomatic and is followed in all jurisdictions."

See also *Albrecht v. State,* 486 S.W.2d 97, 100 (Tex.Cr.App.1972), and cases there cited. See also *Williams v. State,* 662 S.W.2d 344 (Tex.Cr.App.1983); *Nance v. State,* 647 S.W.2d 660 (Tex.Cr.App.1983); *Smith v. State,* 646 S.W.2d 452 (Tex.Cr.App.1983); *Rubio v. State,* 607 S.W.2d 498, 499 (Tex.Cr.App.1980). This Court has consistently held that proof of prior specific acts of misconduct, similar happenings, or the commission of extraneous criminal wrongs which are unrelated to the offense for which the accused is on trial are generally not probative of the contested material issues in the case and are inadmissible. See *Elkins v. State,* 647 S.W.2d 663 (Tex.Cr.App.1983); *Davis v. State,* 645 S.W.2d 288 (Tex.Cr.App.1983); *Bates v. State,* 643 S.W.2d 939 (Tex.Cr.App.1982).

There are exceptions to the nonadmissibility of extraneous offenses, some of which are set out in *Albrecht,* supra, at 101. These exceptions do not represent an exhaustive list. *Williams,* supra, at 346. The test of admissibility of any extraneous offenses or transaction is that it is relevant to a material issue in the case and the probative value of the evidence outweighs its inflammatory or prejudicial potential. See *Rubio,* supra; *Williams,* supra; *Phillips v. State,* 659 S.W.2d 415 (Tex.Cr.App.1983); *Mann v. State,* 718 S.W.2d 741 (Tex.Cr.App.1986).

ed as to the improper impeachment of the appellant as a witness in his own behalf.

■ Once a defendant in a criminal prosecution voluntarily takes the witness stand he is subject to the same rules as any other witness and may be impeached, contradicted, made to give evidence against himself, cross-examined as to new matters, and treated in every respect as any other witness testifying in his behalf, except when there are overriding constitutional or statutory provisions. *Sanchez v. State,* 707 S.W.2d 575 (Tex.Cr.App.1986); *Cisneros v. State,* 692 S.W.2d 78 (Tex.Cr.App.1985); *Baxter v. State,* 645 S.W.2d 812 (Tex.Cr. App.1983); *Bowden v. State,* 628 S.W.2d 782 (Tex.Cr.App.1982); *Cuellar v. State,* 613 S.W.2d 494 (Tex.Cr.App.1981); *Williams v. State,* 607 S.W.2d 577 (Tex.Cr. App.1980); *Ayers v. State,* 606 S.W.2d 936 (Tex.Cr.App.1980); *Bustillos v. State,* 464 S.W.2d 118 (Tex.Cr.App.1971).

■ Under the provisions of Article 38.-29, V.A.C.C.P., the fact that a witness, an accused or otherwise, has been charged with an offense is inadmissible for the purpose of impeaching him as to his credibility unless the charge has resulted in a final conviction for a felony or an offense involving moral turpitude, and even then it must not be too remote. *Stephens v. State,* 417 S.W.2d 286 (Tex.Cr.App.1967); *Garcia v. State,* 454 S.W.2d 400 (Tex.Cr.App.1970); *Taylor v. State,* 612 S.W.2d 566 (Tex.Cr. App.1981).

■ Where the prior conviction meets the requirements above it may be used for the purpose of impeaching a defendant when he testifies, or the State may prove his general reputation, *Johnson v. State,* 95 S.W.2d 968 (Tex.Cr.App.1936), for when a defendant takes the witness stand he places his credibility in issue. *Hammett v. State,* 713 S.W.2d 102 (Tex.Cr.App.1986).

And as made clear in *Murphy v. State,* 587 S.W.2d 718, 722 (Tex.Cr.App.1979), in limited circumstances "proof of the fact that charges have been filed against a witness may become admissible upon a showing that such evidence tends to establish prejudice, interest, bias or motive of the witness in testifying as he has." See *Simmons v. State,* 548 S.W.2d 386 (Tex.Cr. App.1977); *Evans v. State,* 519 S.W.2d 868 (Tex.Cr.App.1975); *Blake v. State,* 365 S.W.2d 795 (Tex.Cr.App.1963); *Nethery v. State,* 692 S.W.2d 686 (Tex.Cr.App.1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986); *Massengale v. State,* 653 S.W.2d 20 (Tex.Cr.App.1983); *Luna v. Beto,* 395 F.2d 35 (5th Cir.1968), *cert. denied* 394 U.S. 966, 89 S.Ct. 1310, 22 L.Ed.2d 568 (1969).[7]

It should be borne in mind, however, that "it has long been the law of this State that proof of either mere accusations, or specific acts of misconduct, is inadmissible to affect the credibility of the accused or any other witness. *Hoffman v. State,* 514 S.W. 2d 248 (Tex.Cr.App.1974); *Garcia v. State,* 454 S.W.2d 400 (Tex.Cr.App.1970); *Hunter v. State,* 168 Tex.Cr.R. 160, 324 S.W.2d 17 (1959); *Sparks,* supra [366 S.W.2d 591 (Tex.Cr.App.1963) ]; *Reed v. State,* 42 Tex. Cr.R. 572, 61 S.W.2d 925 (1901); *Red v. State,* 39 Tex.Cr.R. 414, 46 S.W. 408 (1894); *Ware,* supra [38 S.W. 198 (Tex.Cr.App. 1896) ]; *McAfee v. State,* 17 Tex.App. 135 (1884)." *Murphy,* supra, at 722. There, of course, is an exception if the witness makes a blanket statement such as having never been charged or convicted of an offense or never having been "in trouble," etc. See *McIlveen v. State,* 559 S.W.2d 815 (Tex.Cr.App.1977); *Hoffman v. State,* 514 S.W.2d 248 (Tex.Cr.App.1974); *Ochoa v. State,* 481 S.W.2d 847, 850 (Tex.Cr.App. 1972).

In the instant case the appellant, after relating his alibi defense, was properly impeached with two prior final felony convictions, arson in 1972 and involuntary manslaughter in 1975. The State was not satisfied with that impeachment and sought fur-

7. As pointed out in *Murphy,* most of the cases deal with the admissibility of pending charges against witnesses for the prosecution where the likelihood exists that in exchange for testimony on behalf of the State the witness may benefit concerning his own criminal charge. In most cases proof of a pending charge against a defense witness has no bearing on his motive to testify for an accused. See, e.g., *Fentis v. State,* 528 S.W.2d 590 (Tex.Cr.App.1975).

ther to show an extraneous act or specific act of misconduct—that of falsifying a statement about his prior convictions when purchasing a firearm (revolver) several months before the alleged offense in 1981. A pistol or revolver was not shown to have been used in the alleged offense, nor was it found in the van or elsewhere. In fact, appellant explained that it had been taken from his car before the alleged offense.

■ The State cannot open the door to matters not otherwise admissible and then prove up the collateral events, unless the events themselves were independently admissible. *Flannery v. State*, 676 S.W.2d 369 (Tex.Cr.App.1984). See also *Shipman v. State*, 604 S.W.2d 182 (Tex.Cr.App.1980); *Hatley v. State*, 533 S.W.2d 27 (Tex.Cr. App.1976).

In *Moreno v. State*, 711 S.W.2d 382 (Tex. App.—Houston [14th Dist.] 1986), the defendant was convicted of attempted capital murder of a police officer. The evidence showed the intoxicated defendant armed with a hunting knife lunged at the police officer who shot him twice. While testifying in his own defense, the court permitted the State, over objection, to cross-examine the defendant about prior acts of misconduct. He was asked if he had previously owned guns and fired guns within the apartment complex where the alleged offense occurred. The defendant could not recall having fired a gun within the apartment complex. The State then brought rebuttal witnesses to show otherwise.

In reversing the conviction in part on this basis, the Court noted the State made no attempt to show the line of questioning was material or relevant to the issue at hand, nor did the State show that the evidence in any way established his scheme, motive, intent, etc. The defendant was not charged with the collateral offenses, much less convicted, and their use for impeachment was held error. Further, the Court noted that the State impeached the defendant on some collateral issue brought out by the State's own cross-examination of the defendant and cited *Flannery*, supra.

*Mauldin v. State*, 165 Tex.Cr.R. 405, 308 S.W.2d 36 (1957), involved a murder prose-

cution where the defendant was shown to have shot the deceased with a gun. The defendant testified he did so in defending himself and the gun "went off" when he struck the deceased, and that he had no intent to kill. On cross-examination the State elicited from him that he had never carried a knife; then over objection, he was asked and admitted he had "gotten in trouble over carrying a knife," and filed on for aggravated assault. He denied he had cut Marvin Booker or did "a little carving" on Curtis Harris.

The Court in reversing the conviction in *Mauldin* noted that having elicited from the defendant on cross-examination that he never carried a knife did not authorize the State to impeach him on the matter. The shooting was with a gun, and carrying a knife was not shown to have any connection with the deceased. The Court held that whether the defendant ever carried a knife was immaterial to any issue of the case, and was impeachment upon an immaterial matter.

■ In the instant case the appellant admitted, although reluctantly, that he had been twice previously convicted. The fact, however, that he may have lied about those convictions on another occasion was an immaterial matter. In impeaching him on this fact the State was permitted to show a specific act of misconduct, the illegal or improper acquiring of a firearm by making a false statement. The appellant was not charged, much less convicted of the collateral offense or offenses, and the use thereof for impeachment was improper under Article 38.29, supra. The State made no effort to show that the line of questioning was material to any issue in the case, nor did the State show that it in any way tended to establish prejudice, interest, bias or motive of the defendant in testifying as he did. No other exception above discussed was shown. There can be little doubt that the probative value of this interrogation of the appellant concerning collateral events was far outweighed by its overwhelming prejudicial effect. *Moreno*, supra. The evidence was improperly admitted over timely objection.

It is well established that a judgment of conviction will not be reversed for error in the admission of evidence that did not injure the defendant. *Gutierrez v. State*, 628 S.W.2d 57 (Tex.Cr.App.1981); *Prior v. State*, 647 S.W.2d 956 (Tex.Cr.App.1983); *Ward v. State*, 657 S.W.2d 133 (Tex.Cr.App.1983); *Self v. State*, 709 S.W.2d 662 (Tex.Cr.App.1986); *Becknell v. State*, 720 S.W.2d 526 (Tex.Cr.App.1986). And error in admitting evidence of uncharged misconduct in a criminal prosecution is not invariably so prejudicial that a reversal of the conviction is required. *Templin v. State*, 711 S.W.2d 30 (Tex.Cr.App.1986); *Gentsch v. State*, 654 S.W.2d 768 (Tex.Cr.App.1983); *Prior v. State*, supra.

In determining whether the error was harmless, the test is not whether a conviction could have been had without the improperly admitted evidence, but, instead is whether there is a reasonable possibility that the evidence might have contributed to the conviction or affected the punishment. *Graham v. State*, 710 S.W.2d 588 (Tex.Cr.App.1986); *Self v. State*, supra; *English v. State*, 647 S.W.2d 667 (Tex.Cr.App.1983); *Prior v. State*, supra. See also *Maynard v. State*, 685 S.W.2d 60 (Tex.Cr.App.1985); *Johnson v. State*, 660 S.W.2d 536 (Tex.Cr.App.1983). Thus, if there is a reasonable possibility that inadmissible evidence might have contributed to either the conviction or punishment assessed, then the error in admission is not harmless error. *Plante v. State*, 692 S.W.2d 487 (Tex.Cr.App.1983). See also *Bordelon v. State*, 683 S.W.2d 9 (Tex.Cr.App.1985). In applying the test the main consideration is the probable impact of the evidence on the minds of the average jury. *Gauldin v. State*, 683 S.W.2d 411 (Tex.Cr.App.1984); *Vanderbilt v. State*, 629 S.W.2d 709 (Tex.Cr.App.1981), *cert. den.* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed. 2d 169 (1982), citing *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).

And in determining whether there is harmful error in the admission of improper evidence the facts and circumstances of the individual case must be considered. *Bird v. State*, 692 S.W.2d 65 (Tex.Cr.App.1985), *cert. den.* 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986); *Becknell v. State*, 720 S.W.2d 526 (Tex.Cr.App.1986). See also *Prior v. State*, supra; *Bass v. State*, 622 S.W.2d 101 (Tex.Cr.App.1981), *cert.den.* 456 U.S. 965, 101 S.Ct. 2046, 72 L.Ed.2d 491 (1982); *Ruiz v. State*, 579 S.W.2d 206 (Tex. Cr.App.1979). See also *Simons v. State*, 167 Tex.Cr.R. 15, 317 S.W.2d 740 (1958) (the entire record must be viewed).

The State's case against the appellant was circumstantial. Appellant's defense was alibi. Though there were two prior felony convictions, for the purpose of impeachment, he was entitled to have his defense presented to the jury without evidence of a specific act or acts of misconduct that were extraneous and immaterial to any issue in the cause. See and cf. *Franklin v. State*, 606 S.W.2d 818, 851 (Tex.Cr.App.1979) (Opinion on Appellant's Motion for Rehearing) (Onion, P.J.) We conclude there is a reasonable possibility that the inadmissible evidence bearing on appellant's credibility might have contributed to the conviction, particularly in light of viewing the record as a whole and finding the error in admission was revived not once, but twice during jury argument at the guilt stage of the trial with the jury being particularly urged to consider such evidence in determining whether the appellant was telling the truth about his defense. See and cf. *Wright v. State*, 609 S.W.2d 801 (Tex.Cr.App.1980); *Templin v. State*, 711 S.W.2d 30, 34 (Tex.Cr.App.1986).

We are compelled to sustain appellant's point of error. We are reluctant to reverse a conviction of this nature, but action of the State and the ruling of the trial court leave us no choice in view of our oaths. See Article XVI, § 1, Texas Const.

The judgment is reversed and the cause remanded to the trial court.

DAVIS, MILLER and CAMPBELL, JJ., dissent to reversal on the impeachment issue.

WHITE, J., not participating.