# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00202-CR

**Robert Wilson Aleman, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 119TH JUDICIAL DISTRICT
NO. B-02-1067-S, HONORABLE BEN WOODWARD, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Robert Wilson Aleman appeals his conviction for manufacturing methamphetamine in an amount of four grams or more but less than two hundred grams. *See* Tex. Health & Safety Code Ann. § 112(d) (West 2003). After the jury found him guilty, it assessed punishment at twenty-five years in the Texas Department of Criminal Justice-Institutional Division. In two issues on appeal, Aleman challenges the legal and factual sufficiency of the evidence to support his conviction. We affirm the trial court's judgment.

## Background

Ronald Scandolari testified that during the afternoon of October 27, 2001, he and his seventeen-year-old son, Blake, were at their deer lease on the March Ranch. As they were riding around the lease on their four-wheelers, they noticed a pile of trash they had not seen on the property

before: a pump sprayer, Sudafed packages, starter fluid, Drano, a glass beaker, an empty salt container, and a syringe. Scandolari also noticed a piece of paper with what appeared to be some form of recipe and with mathematical formulas that equated to a dollar amount. Scandolari called the Tom Green County Sheriff's Department and told them about the debris he found, but the authorities could not respond to the scene that night.

The next morning, Scandolari, Blake, and Scandolari's other son, Michael, returned to the site of the debris, and found a vehicle parked there. Scandolari "saw a lady running off." Scandolari again called the sheriff's department, offering to have his sons meet the officers at the entrance to the ranch. While the sons waited at the gate, Scandolari continued to watch the vehicle. At one point that vehicle pulled up to his vehicle, allowing him to see the male driver, who was later identified as appellant, and the female passenger. Appellant then tried to leave the ranch and encountered a Tom Green County sheriff's deputy. Appellant fled, drove off the road, grounded the car on some brush, and then he and the passenger fled on foot.

Michael Scandolari testified that on the morning of October 28, while he was with his father and his brother Blake on the deer lease, they saw a man and a woman standing next to a vehicle. The man appeared to be loading items into the vehicle. Michael also testified that the vehicle was parked next to what he thought was a "drug lab" because he observed items such as a plastic pickle jar with "pinkish-red-like, crushed-up" materials inside, a sprayer, a couple of syringes, and a "bunch" of batteries that had been broken open. Michael testified that his father called the sheriff's office, then he and his brother met the deputy at the entrance to the ranch. As the deputy

2

and the brothers approached the site, Michael saw appellant's vehicle turn off the road, ground itself on some brush, and stop. The occupants of the car then ran away on foot.

Buffy Jo Walker testified that early in the morning of October 28, 2001, appellant drove her to the ranch so he could show her how to "cook" methamphetamine. Before appellant picked her up, Walker purchased some pills, some lithium batteries, and other items needed to manufacture the methamphetamine. Walker testified that a cooler with anhydrous ammonia was already at the location. Walker said that appellant bought a pump sprayer and a metal suitcase and used it to hold screwdrivers, metal cutters, and other tools.

Walker then described how she and appellant manufactured the methamphetamine. They cut open the lithium batteries with a wire cutter, added pieces of lithium to a chemical in a bucket, and stirred the substance to create a chemical reaction. Walker testified that when Scandolari discovered them, they left the site and tried to leave the property. When they saw the deputy, appellant left the road and started driving through a pasture. After the car got stuck in the brush, they ran and hid.

Deputy Sheriff Charles Slaughter testified that he saw two people inside a vehicle that veered off the road and drove into a wooded area where the occupants fled. Slaughter testified that he stayed with the vehicle until the search for the occupants ended. Slaughter observed some gas or smoke coming from a container with an ammonia smell to it that was on the floorboard behind the driver's seat.

Deputy James Smith testified that he was involved in the investigation of the methamphetamine lab at the deer lease on the day in question. When he arrived on the scene, he

3

smelled the odor of ammonia inside the car. At the lab's location, Smith found an orange cooler smelling of ammonia, numerous punctured starter fluid cans, and pieces of lithium batteries. Smith testified that these items were significant because they were commonly used in manufacturing methamphetamine.

Smith also testified that when he searched the vehicle, he found two duffle bags on the rear seat, and a small fire safe and pump spray bottle on the rear floorboard. Smith also found a cardboard box on the back seat with some glass Mason jars, plastic baggies, and an open container of "Liquid Fire," a source of sulfuric acid used in manufacturing methamphetamine. Two of the glass jars contained liquid. According to Smith, several of the containers he found contained "pill wash" or pseudoephedrine pills that were crushed up and soaked during the manufacture of methamphetamine. Smith also found an open box of coffee filters and a set of scales. Inside the safe, Smith found pliers, lithium batteries, and a package of five syringes.

Smith conducted a field test on the liquid contained in each of the two Mason jars. Only the liquid from the larger jar tested presumptively positive for methamphetamine. The liquid from each jar was poured into five smaller plastic containers and transported by Smith to the Department of Public Safety Laboratory in Midland.

Constable Alvie Hester testified that he assisted in the investigation. According to Hester, when he approached the appellant's vehicle, he noticed an odor of ammonia and ether coming from the vehicle. Hester said the odors were significant because these are odors from materials commonly used in clandestine drug labs to manufacture methamphetamine. Items collected at the lease included pieces from the insides of lithium batteries, a gallon jug with a

4

"brownish, pinkish" residue inside, plastic tubing, cans of starter fluid with holes punched in the bottom to extract ether, a glove, and coffee filters, some of which had residue on them.

Sergeant Brian McDougal testified as an expert on the methods used in the clandestine manufacture of methamphetamine. A white or pinkish-red granular material such as that found at the scene is consistent with Sudafed, an item used in manufacturing methamphetamine. Tubing, cans of starter fluid, tools such as pliers and screwdrivers, mason jars, coolers, pump sprayers, plastic jugs, coffee filters, "Liquid Fire," and lithium batteries are all used in the clandestine manufacture of methamphetamine.

Dennis Hambrick, a chemist with the Texas Department of Public Safety, testified that he analyzed the liquid samples submitted in this case. Four of the samples tested positive for methamphetamine. Hambrick's analysis showed the weight of each of the four liquids, including methamphetamine, adulterants and dilutants, to be 26.96 grams, 27.51 grams, 11.23 grams, and 0.77 grams.

## Discussion

*Standard of Review*

Appellant challenges the legal and factual sufficiency of the evidence to support his conviction. Under a legal sufficiency review, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 309 (1979); *Staley v. State*, 887 S.W.2d 885, 888 (Tex. Crim. App. 1994). The sufficiency of the evidence is determined from the cumulative effect of all the evidence; each fact in isolation need not establish the guilt of

5

the accused. *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987). The jury as trier of fact is entitled to resolve any conflicts in the evidence, to evaluate the credibility of the witnesses, and to determine the weight to be given any particular evidence. *See Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996).

In a factual-sufficiency review, the reviewing court "views all the evidence without the prism of 'in the light most favorable to the prosecution,'" and sets aside the verdict only if it is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). In such a review, the court asks whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is too weak or that the contrary evidence is too strong to rationally support a finding of guilt beyond a reasonable doubt. *Zuniga v. State*, No. 539-02, 2004 Tex. Crim. App. LEXIS 668, at *20 (Apr. 21, 2004). In other words, considering all the evidence in a neutral light, we determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt. *Id*. Appellate courts are not free to reweigh the evidence and set aside a jury verdict merely because the reviewing judges feel that a different result is more reasonable. *Clewis*, 922 S.W.2d at 135. A factual-sufficiency review must employ appropriate deference to the fact-finder's role as the sole judge of the weight and credibility to be given to witness testimony. *Johnson*, 23 S.W.3d at 7.

### *Manufacture of a controlled substance*

In his first and second issues, appellant contends that the evidence was legally and factually insufficient to prove the offense of "intentionally and knowingly manufacturing a controlled substance in an amount of four grams or more but less than two hundred grams." *See* Tex. Health

6

& Safety Code Ann. § 481.112 (d) (West 2003).  He urges that the State did not prove that appellant

manufactured methamphetamine in the amount alleged.[1]

A controlled substance is "a substance, including a drug, an adulterant, and a dilutant,

listed in Schedules I through V or Penalty Groups 1, 1-A, or 2 through 4.  The term includes the

aggregate weight of any mixture, solution, or other substance containing a controlled substance."

*Id*. § 481.002(5) (West Supp. 2004).  An "adulterant or dilutant" is "any material that increases the

bulk or quantity of a controlled substance, regardless of its effect on the chemical activity of the

controlled substance."  *Id*. § (49).  After 1993 amendments to the Health and Safety Code, the State

was no longer required to prove that adulterants and dilutants were added with the intent to increase

the bulk or quantity of the controlled substance or that they had no effect on the chemical activity

of the controlled substance.  *See Williams v. State*, 939 S.W.2d 399, 405 (Tex. App.—Fort Worth

1996, pet. ref'd) (State no longer required to prove that added adulterants or dilutants had not

affected chemical activity of controlled substance).

Under the current definition of adulterants and dilutants, the State is not required to

determine the existence or amount of any adulterants or dilutants that may have been added to the

controlled substance.  Rather, the State need only prove that the controlled substance, including any

adulterants or dilutants, equals the minimum weight set forth in the indictment.  *Melton v. State*, 120

S.W.3d 339, 343 (Tex. Crim. App. 2003); *Cuddy v. State*, 107 S.W.2d 92, 95 (Tex.

---

[1]  In places in his brief, appellant seems to be arguing that the State could not show possession of a controlled substance with intent to deliver because all he possessed was an immediate precursor. The only offense at issue was the *manufacture* of a controlled substance.  Appellant does not contest the other elements of the offense of manufacturing a controlled substance.

App.—Texarkana 2003, no pet.); *Isassi v. State*, 91 S.W.3d 807, 810 (Tex. App.—El Paso 2002, pet. ref'd). The term "controlled substance" includes the aggregate weight of any mixture, *solution*, or other substance containing a controlled substance." Tex. Health & Safety Code Ann. § 481.002(5) (West Supp. 2004) (emphasis added).

*Melton* involved a single plastic bag containing thirty-five to forty rocks of a substance that appeared to be crack cocaine. 120 S.W.3d at 340. The weight of the bag was 6.4 grams and the rocks field-tested positive for cocaine. *Id*. The Department of Public Safety chemist testified that he tested an unspecified number of the rocks from this bag using an ultraviolet spectrophotometer and a gas chromatography mass spectrometer and confirmed each contained cocaine. *Id*. at 341. He testified that the weight of the substance in the bag was 5.77 grams. *Id*. at 340. The court of appeals found the evidence legally insufficient to prove that the items in the bag included four grams of crack cocaine. The court of appeals hypothesized that some of the thirty-five to forty items may not have contained any cocaine and concluded that if one of the "rocks" was composed entirely of a non-cocaine substance, then those substances were not adulterants or dilutants and their weight could not be added to the aggregate weight of the cocaine. *Id*. at 341.

The court of criminal appeals rejected that analysis, concluding that the appellate court should not have treated each rock as a separate controlled substance but should have treated all the rocks as a mixture because the term "controlled substance" includes the "aggregate weight of any mixture, solution, or other substance containing a controlled substance." *Id*. at 343 (quoting Tex. Health & Safety Code Ann. § 481.002(5)). The court of criminal appeals noted that the State is no longer required to determine the amount of controlled substance separately from the amount

8

of adulterants and dilutants that constitute the mixture, but has to prove only that the aggregate weight of the controlled substance mixture, including adulterants and dilutants, equals the alleged minimum weight. *Id*. at 344. The court of criminal appeals concluded it was reasonable for the jury to infer that the thirty-five to forty rocks formed a mixture of crack cocaine, even if some of the "rocks" were composed only of non-cocaine substances. *Id*. at 343-44.[2]

In this case, four of the five liquids tested contained methamphetamine and adulterants and dilutants. A chemist so testified, and testified to the weight of the liquid in each of the four jars testing positive for methamphetamine. The aggregate weight of the controlled substance was derived by adding together the weights of each of the four liquids that contained methamphetamine. The State did not have to establish the weight of the "pure" methamphetamine in each jar of liquid versus the weight of any of the liquid that was an adulterant or dilutant, but only that the aggregate weight of the controlled substance mixture equaled the alleged minimum weight. *See id*. at 344.

Appellant complains that all that he possessed was an "immediate precursor," not actual methamphetamine, apparently relying on the liquid form in which the methamphetamine was found.[3] The form in which a controlled substance is recovered does not determine whether the

---

[2]   *See also Hayes v. State*, 132 S.W.3d 147, 155 (Tex. App.—Austin 2004, no pet.) (applying *Melton v. State*, 120 S.W.3d 339 (Tex. Crim. App. 2003), to a bag containing twenty rocks and some "crumbs" with an aggregate weight of 4.47 grams).

[3]   *See Blackburn v. State*, No. 02-01-00464-CR, 2003 Tex. App. LEXIS 1597, *2-3 (Tex. App.—Fort Worth Feb. 20, 2003, pet. ref'd) (not designated for publication) (state not required to prove that "reaction by-products" that may have been in liquid that tested positive for methamphetamine were "immediate precursors" to rely on total calculated weight of exhibit; current definition of controlled substance and adulterants and dilutants broad enough to encompass "reaction by-products" if any were contained in liquid).

accused has committed the offense of manufacturing the drug. *Green v. State*, 930 S.W.2d 655, 657 (Tex. App.—Fort Worth 1996, pet. ref'd); *Fronatt v. State*, 630 S.W.2d 703, 704 (Tex. App.—Houston [1st Dist.] 1981, pet. ref'd). In this case, the chemist testified that methamphetamine was present in four of the five tested liquids, along with adulterants and dilutants. The State was not required to prove the exact weight of every component of the solution containing methamphetamine. *See Melton*, 120 S.W.3d at 344.

## Conclusion

Viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found that appellant manufactured methamphetamine in an amount of over four grams. Accordingly, the evidence is legally sufficient. *See Jackson*, 443 U.S. at 307. A neutral review of the evidence, both for and against the finding, does not demonstrate the proof of guilt is too weak or that the contrary evidence is too strong to rationally support a finding of guilt beyond a reasonable doubt. Accordingly, the evidence is factually sufficient. *See Zuniga v. State*, No. 539-02, 2004 Tex. Crim. App. LEXIS 668, at *20 (Apr. 21, 2004).[4]

---

[4] In fact, appellant did not produce contrary evidence, but simply relied on cases that have been superseded by statute and case law.

Accordingly, we overrule both of appellant's issues. We affirm the trial court's judgment.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Patterson

Affirmed

Filed: July 29, 2004

Do Not Publish