In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-04-392 CR


____________________



JASON DEWAYNE NICHOLSON, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 159th District Court


Angelina County, Texas


Trial Cause No. 24,535






OPINION


 On August 5, 2004, appellant, Jason Dewayne Nicholson, waived his right to a jury
and proceeded to trial on charges contained in two separate indictments. In Cause Number
24,532, appellant was charged with having committed Aggravated Assault of a Public
Servant (1) on or about March 17, 2004, by shooting at Fred Shewmake, a peace officer who
was attempting to detain or arrest appellant. In Cause Number 24,535, the indictment
contained two counts. In the first count, appellant was again charged with Aggravated
Assault of a Public Servant on or about March 17, 2004, by shooting at Brad Prince, a
peace officer who was attempting to detain or arrest appellant. In the second count,
appellant was charged with Attempted Capital Murder on or about March 17, 2004, by
discharging a firearm in the direction of Mike Wilson, with the specific intent to commit
the offense of capital murder, with said act amounting to more than mere preparation that
tended but failed to affect the commission of the offense intended. (2) At the conclusion of
the trial, the trial court found appellant guilty on all three charges. The trial was recessed
for preparation of a pre-sentence investigation report (PSI) with the trial court ultimately
sentencing appellant to confinement in the Texas Department of Criminal Justice -
Correctional Institutions Division for life on all three charges. Appellant has not appealed
his conviction in Trial Cause Number 24,532. The instant appeal from the conviction in
Trial Cause Number 24,535, raises the issues of lack of both legally and factually
sufficient evidence to sustain the convictions on each count alleged. Finding no error
occurred in the court below, we affirm.

 The facts surrounding the shootings in question are not contested. The record
indicates that shortly after 4:00 p.m. on March 17, 2004, Fred Shewmake, a Texas game
warden and certified peace officer, pulled over a vehicle matching the description of one
involved in an aggravated robbery earlier that day. The vehicle initially appeared to
contain one person, the driver, but when the vehicle stopped, two additional individuals
raised up, causing them to come into view. The driver was later identified as a male
named Hooper. Through the combined testimony of Game Warden Shewmake, the two
other complainants (Trooper Brad Prince and Deputy Mike Wilson), Sergeant Dawn
Stripling of the Angelina County Sheriff's Office, and Texas Ranger Sergeant Pete
Maskunas, the front-seat passenger was identified as appellant, and the back-seat passenger
identified as Carl Austin. Shewmake testified that when the suspects' vehicle stopped,
Austin and appellant jumped out almost simultaneously. Within a matter of seconds, the
front-seat passenger (appellant) pointed a handgun directly at Shewmake's face and fired
a shot. Shewmake immediately returned fire. At some point during the shooting, the
driver, Hooper, got out of the vehicle and dropped to the ground where he remained until
Shewmake was able to handcuff him. Shewmake placed Hooper in Shewmake's Parks and
Wildlife truck. 

 At trial, Shewmake was positive that appellant was not the driver of the suspect-vehicle as Shewmake had spent time with the driver at the scene of the initial shooting.
Shewmake further testified that appellant could not have been the rear-seat passenger
because his memory of the rear-seat passenger was of a man who was "kind of long and
lanky," while the front-seat passenger was "short and just average build." Shewmake
considered his (Shewmake's) height, 5'11", as being similar to that of the rear-seat
passenger who Shewmake thought was close to six feet tall. By contrast, Shewmake noted
that the front-seat passenger was "quite a bit shorter than me." Although unable to state
"beyond a reasonable doubt" that appellant was the front-seat passenger/shooter,
Shewmake justified his belief that appellant was the assailant through "the process of
elimination." 

 An additional pertinent fact from Shewmake's testimony indicated that the handgun 
used in the shooting appeared to be a semi-automatic pistol and dark in color. He further
described the taller, rear-seat passenger's clothing to have consisted of a red, sleeveless
jersey with a white T-shirt underneath, and black shorts. The front-seat passenger, who
shot at Shewmake, was wearing pants that were either blue jean or denim-type pants, or
a cotton blend, and wore either a short-sleeve shirt or no shirt at all. Shewmake added that
he was approximately twenty-five feet from the front-seat passenger when the man fired
the shot, and that he (Shewmake) had no problem seeing the events as they all happened
around 4:30 in the afternoon, on a clear day with plenty of daylight. Also, Shewmake was
in full-uniform and wearing his badge, name-tag, and gun-belt. After the exchange of
gunfire, both passengers ran up a hill and eventually into a nearby wooded area. 

 It was during the subsequent manhunt for appellant and Carl Austin that the
complainants (Prince and Wilson) in the instant appeal were fired upon. Both instances
took place after dark and neither complainant could positively say it was appellant who
fired the shots at them. The record indicates that while it was still dark, appellant
surrendered to law enforcement as they closed in on his position, but Carl Austin continued
hiding from the authorities until after daybreak on March 18. Two days later, the
authorities discovered a nine millimeter semi-automatic handgun in the wooded area very
close to where appellant surrendered. Without objection, (3) Sergeant Pete Maskunas of the
Texas Rangers, one of two men "in charge of the scene," summarized a portion of his
involvement and investigation as follows: 

 Q.[State] Okay. And did you see any of the suspects taken into custody? 
Were you present when any of those individuals were brought in?


 A.[Maskunas] I was -- I was in the area, but, no, I was not present to see the
actual subject being taken into custody, except for later on in the day when
I actually took one into custody myself.


 Q. Okay.


 A. Not this individual.


 Q. So, you took another individual into custody?


 A. Yes, sir. 


 Q. Okay. Did you have information as to who the first suspect was, or who
was taken into custody?


 A. Yes, sir, I did. I had contact with the officers that took him into
custody.


 Q. Okay. And they were able to tell you who that individual was?


 A. Yes, sir, they were.


 Q. And who was that?


 A. That was Jason Nicholson. 


 Q. Okay.


 A. And he is sitting here in the courtroom.


 Q. Okay. And you said you took the third suspect into custody yourself?


 A. Yes, sir. With the assistance of the SWAT team.


 Q. Okay. About what time was that?


 . . . . 


 Q. Okay. Can you describe what that individual looked like, what he was
wearing, height, or anything like that?


 A. He was -- I believe he was wearing a pair of tennis shoes and a pair of
shorts, and I'm not sure if he was wearing a shirt or not.


 Q. Okay.


 A. I can't recall exactly.


 Q. Okay. Did he have a weapon on him?


 A. No, he did not.


 Q. Okay. And did you all locate a weapon in his vicinity?


 A. No, sir, we did not.


 . . . .


 Q. Ranger Maskunas, did you have any other -- did you fulfil any other role
as far as investigating this? Once -- once the suspects had been taken into
custody that night you were out on the scene, what did you do after
everybody had been taken in?


 A. . . . . 


 We conducted interviews with all three -- with all three suspects, two
of which were actual interviews. The interview with Mr. Nicholson, he
invoked his right to counsel and he was not -- aside from being given his
Miranda Warning, no further action was taken with him.


 I then also obtained search warrants for hair, skin and DNA samples
from all three suspects. I stood by and assisted the DPS crime lab when they
processed the vehicle that the suspects had been driving in when the shooting
occurred on Game Warden Shewmake. I also was involved in all the
searches of the crime scenes, and involved in the actual recovery of this
weapon. 


 I also coordinated with the pilots to obtain the flare video from the
flare camera inside of the helicopter. I pretty much then put the whole case
together.

 

 Q. Okay. And did you come to any conclusions based on your investigation
as to what happened? You said you were able to conduct interviews with the
subjects. Did you also conduct interviews with the officers who were out
there and involved in the shooting?


 A. Yes, sir, I did.


 Q. Okay. And based on those investigations and the things that you
performed, were you able to base any conclusions as to if and which suspects
committed these acts?


 A. Yes, sir. We were able to conclude, based on interviews with two of the
suspects that were very detailed, and also with the interviews of the officers,
that Mr. Nicholson fired the weapon at officers on all three occasions. 


 Q. Okay.


 A. And that the weapon was, in fact, in his possession from the time that
they committed aggravated robbery in Woodville to the time that they were
actually -- he was actually captured and he left the weapon in the woods. 


 . . . .


 Q. Okay. Do you know -- you were out there the remainder of the evening
after Mr. Nicholson was taken into custody?


 A. Yes, sir, I was.


 Q. Were any other shots fired that night?


 A. No, sir. 


 . . . .


 Q.[By (State)] This is going to be State's Exhibit Number 11. If you could
please open that package and tell me what items those are.


 A. [Witness complies.] 


 Q. Could you describe what those are?


 A. Yes, sir. It appears to be a pair of blue pants. I'm not sure what brand
they are. It appears to be a pair of -- they are Haggar Generation pants, and
-- I'm not going to touch them, but there appears to be a pair of men's
underwear inside the pants.


 Q. Okay. And where were these collected from? Did you collect these?


 A. No, sir, I did not.


 Q. Okay. When did you come into possession of these?


 A. I came into possession of these on the 23rd, when they were taken from
the sheriff's [sic] department's evidence locker and given to the technicians
with the DPS crime lab.


 Q. Okay. And were [sic] one of the suspects wearing these pants?


 A. The information that I was given was that these were the pants that were
taken from Jason Nicholson at the time of his arrest. 


 On cross-examination, Sergeant Maskunas was asked to specify the three occasions
his investigation revealed that appellant had fired shots, and Maskunas replied as follows: 

 A.[Maskunas] The shot that was fired at Game Warden Shewmake at the
initial stop. The shot that was fired at Corporal Prince around -- oh,
probably around late 9:30, 9:45, somewheres around there. And then the
shot that was fired at the officers, Chief Yoscow and Mike Taylor [sic], and
other officers that were there. Those three -- those three incidences.


 In assessing the legal sufficiency of trial evidence to support a conviction, we
consider all of the record evidence in the light most favorable to the verdict (4) and then
determine whether, based on that evidence and reasonable inferences therefrom, any
rational trier of fact could have found each of the essential elements of the offense proven
beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781,
61 L.Ed.2d 560 (1979); Conner v. State, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). 
When conducting a sufficiency review, we consider all of the "light most favorable"
evidence admitted, whether admitted properly or improperly. Conner, 67 S.W.3d at 197. 
See also Moff v. State, 131 S.W.3d 485, 488 (Tex. Crim. App. 2004). When the record
contains evidence circumstantial in nature, the standard of review is the same as it is for
reviewing direct evidence. (5) See Kutzner v. State, 994 S.W.2d 180, 184 (Tex. Crim. App.
1999). Indeed, circumstantial evidence alone may be sufficient to support a finding of
guilt. Id. 

 With regard to reviewing a trial record for factually sufficient evidence to support
a criminal conviction, the question to be answered is: Considering all of the evidence in
a neutral light, was the trier of fact rationally justified in finding guilt beyond a reasonable
doubt? See Zuniga v. State, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004). To facilitate
answering this question, the Court of Criminal Appeals has set out two ways which trial
evidence may be factually insufficient:

 First, when considered by itself, evidence supporting the verdict may
be too weak to support the finding of guilt beyond a reasonable doubt. 
Second, there may be both evidence supporting the verdict and evidence
contrary to the verdict. Weighing all the evidence under this balancing
scale, the contrary evidence may be strong enough that the beyond-a-reasonable-doubt standard could not have been met, so the guilty verdict
should not stand. This standard acknowledges that evidence of guilt can
"preponderate" in favor of conviction but still be insufficient to prove the
elements of the crime beyond a reasonable doubt. Stated another way,
evidence supporting guilt can "outweigh" the contrary proof and still be
factually insufficient under a beyond-a-reasonable-doubt standard.


Id. at 484-85. Additionally, in a factual sufficiency review, courts of appeals are required
to consider and discuss the most important evidence that the appellant claims undermines
the verdict. See Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003). In keeping
with the "common sense approach" suggested in Tex. R. App. P. 47.1, courts of appeals
must "show their work" unless issuing a memorandum opinion. Sims, 99 S.W.3d at 603-04.

 In the instant appeal, appellant's lone argument for legal and factual insufficiency
under both convictions is the State's failure to identify appellant as the assailant. Appellant
boils his argument down to the following: 

 In our case, one of the essential elements as alleged in the indictment
is that Jason Nicholson is the individual who committed aggravated assault
against Brad Prince, and attempted capital murder against Mike Wilson. 
However, the police officers never saw who shot at them. No co-defendant
testified against the Appellant. No confession was introduced at trial. No
scientific test linked Appellant to the crime by way of DNA tests, gunpowder
tests, or any other test. No witness pointed the Appellant out in the
courtroom and positively identified him as the individual involved in these
offenses. No witness came forward and said they saw the Appellant shoot
anyone. No witness came forward and testified that the Appellant was being
criminally responsible for anothers' (sic) conduct under the law of parties. 
Therefore, no rational trier of fact could have found that it was actually the
Appellant who committed these offenses. (footnote omitted).


 In making this argument, appellant appears to entirely discount the fact that, as
noted above, circumstantial evidence alone may also support a conviction. See Kutzner,
994 S.W.2d at 184. Circumstantial evidence is as probative as direct evidence in
establishing an actor's guilt. See Guevara v. State, 152 S.W.3d 45, 49 (Tex. Crim. App.
2004). Furthermore, under legal sufficiency review, we include all reasonable inferences
in our consideration of the "light most favorable" evidence. See Jackson, 443 U.S. at 318-19; Sanders v. State, 119 S.W.3d 818, 820 (Tex. Crim. App. 2003). We are also
permitted to look at events occurring before, during, and after the commission of the
offense. Guevara, 152 S.W.3d at 49 (citing Cordova v. State, 698 S.W.2d 107, 111 (Tex.
Crim. App. 1985) and Thompson v. State, 697 S.W.2d 413, 416 (Tex. Crim. App. 1985)). 
Each fact need not point directly and independently to the guilt of the appellant as long as
the cumulative effect of all the incriminating facts are sufficient to support the conviction. 
Guevara, 152 S.W.3d at 49 (citing Alexander v. State, 740 S.W.2d 749, 758 (Tex. Crim.
App. 1987) and Russell v. State, 665 S.W.2d 771, 776 (Tex. Crim. App. 1983)). As
appellant presented no witnesses or evidence in his defense, we have only the testimony
and physical evidence presented by the State. 

 As noted above, the State's case began with Game Warden Shewmake detailing the
events before, during, and after the aggravated assault on him. Shewmake's testimony
strongly indicated that it was appellant who fired the shot at him. This conclusion is based
upon the notable dissimilarities between the physical appearance and clothing of appellant
and of Carl Austin as described by Shewmake. As trier of the facts, the trial court was
free to give great weight to this testimony as appellant was physically present in the
courtroom for the trial court to observe. Furthermore, appellant's argument that no
witness pointed appellant out in the courtroom and positively identified him as the
individual involved in these offenses is highly misleading in that it entirely ignores the
extensive circumstantial evidence indicating appellant was the assailant in all three
incidents. From the time of his shooting at Game Warden Shewmake, appellant,
accompanied by Carl Austin, was fleeing the authorities. The subsequent manhunt
described by the State's witnesses was quite extensive and involved officers from several
jurisdictions including the Texas Rangers. The manhunt included the use of tracking dogs,
personnel on horseback, and a helicopter equipped with a type of sensor or tracking device
that could apparently detect the body heat of persons being tracked or searched for at
night. At the point the gunshot was fired at Prince, and then later at Wilson, appellant and
Carl Austin were still the only individuals involved. There was never any evidence raised
from any source of the presence of a third, unknown person who could have been
responsible for firing the shots. Wilson's testimony indicated that appellant surrendered
very shortly after having shot in Wilson's direction, with Wilson being only about fifteen
yards from appellant when the shot was fired. 

 Finally, the testimony from Sergeant Maskunas, describing the subsequent capture
of Carl Austin and the ensuing investigation, including interviews with Hooper and Austin,
confirmed that appellant was the only one of the three original robbery suspects to have
fired the shots at Warden Shewmake, Trooper Prince, and Deputy Wilson. Considering
the evidence in the light most favorable to the verdicts, any rational trier of fact could have
found appellant committed both offenses as alleged in the indictment. Additionally, taking
all of the evidence in a neutral light, we again find the trial court was rationally justified
in finding appellant guilty under both counts of the indictment. Considered by itself, the
circumstantial evidence was certainly strong enough to support the verdicts beyond a
reasonable doubt. Even fully considering the fact that neither Prince nor Wilson could
positively say it was appellant who fired the shots at them, this does not so outweigh the
remaining identification evidence from all sources that we must conclude the verdicts were
not proven beyond a reasonable doubt. In other words, this is not a case where the
evidence supporting appellant's guilt on each count merely preponderates in favor of
conviction but is otherwise insufficient under the beyond-a-reasonable-doubt standard in
proving appellant was the assailant. Therefore, we find the evidence before the trial court
legally and factually sufficient to sustain the convictions under both counts of the
indictment. (6) We overrule the four appellate issues presented and affirm the judgments of
conviction on both counts as alleged in the indictment. 

 AFFIRMED.


 


 _____________________________

 STEVE MCKEITHEN

 Chief Justice



Submitted on March 25, 2005

Opinion Delivered April 20, 2005

Publish


Before McKeithen, C.J., Kreger and Horton, JJ.
1. See Tex. Pen. Code Ann. § 22.02(a)(2), (b)(2) (Vernon Supp. 2005).
2. See Tex. Pen. Code Ann. § 15.01(a) (Vernon 2003); Tex. Pen. Code Ann. §
19.03(a)(1) (Vernon Supp. 2005). 
3. Under Rule 802 of the Texas Rules of Evidence, the trier of fact is entitled to give
probative value to otherwise inadmissible hearsay admitted without objection. See
Poindexter v. State, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005). Once the trier of fact
has weighed the probative value of unobjected-to hearsay evidence in its factfinding
process, an appellate court cannot deny that evidence probative value or ignore it in its
review of the sufficiency of the evidence. Id. 
4. A "verdict" is defined by statute as "a written declaration by a jury of its decision
of the issue submitted to it in the case." Tex. Code Crim. Proc. Ann. art. 37.01
(Vernon 1981) (emphasis added). "Verdict" by definition does not apply to a trial court's
decision, although the word is used loosely in the statutes and case law. See State v.
Lewallen, 927 S.W.2d 737, 739 n.2 (Tex. App.--Fort Worth 1996, no pet.); State v.
Davenport, 866 S.W.2d 767, 769 n.2 (Tex. App.--San Antonio 1993, no pet.). For
simplicity's sake, we will occasionally utilize the term "verdict" in this opinion ever-mindful that trial was to the judge, not to a jury.
5. "Circumstantial evidence is 'direct proof of a secondary fact which, by logical
inference, demonstrates the ultimate fact to be proven.'" See Cowan v. State, 840 S.W.2d
435, 438 n.10 (Tex. Crim. App. 1992) (quoting Taylor v. State, 684 S.W.2d 682, 684
(Tex. Crim. App. 1984)).
6. Although we find the evidence supports appellant's convictions as the primary
actor under both counts of the indictment, we note that in a bench trial, the trial court may
use the law of parties if the evidence supports that theory despite the absence of such
allegations in the indictment. Leon v. State, 102 S.W.3d 776, 781-82 (Tex. App.--Houston [14th Dist.] 2003, no pet.); Diaz v. State, 902 S.W.2d 149, 151 (Tex. App.--Houston [1st Dist.] 1995, no pet.). See generally Malik v. State, 953 S.W.2d 234, 239-40
(Tex. Crim. App. 1997).