

NUMBER 13-08-00661-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**ROBERTO QUIROGA,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

**On appeal from the 103rd District Court of Cameron County, Texas.**

# MEMORANDUM OPINION

**Before Justices Rodriguez, Garza, and Vela**
**Memorandum Opinion by Justice Garza**

Appellant, Roberto Quiroga, appeals his convictions for murder and tampering with physical evidence. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1) (Vernon 2003), 37.09(a) (Vernon Supp. 2008). After a jury trial, Quiroga was convicted of two counts of murder and one count of tampering with physical evidence. The jury assessed punishment at thirty years' incarceration in the Institutional Division of the Texas Department of Criminal Justice

for each of the murder counts and ten years' incarceration for the count of tampering with physical evidence. The sentences were ordered to run concurrently. By four issues, Quiroga alleges that the evidence supporting his convictions is legally and factually insufficient. We affirm.

## I. BACKGROUND

A Cameron County grand jury indicted Quiroga with two counts of murder, one count of aggravated assault, three counts of deadly conduct, and one count of tampering with physical evidence.[1] The charges alleged in the indictment stemmed from Quiroga's shooting of Eleazar Pantoja on April 15, 2007, Quiroga's subsequent flight to Mexico, and his sale of the weapon used to shoot Eleazar.

At Quiroga's jury trial, the State called several witnesses in its case-in-chief, including Officers Robert Ahrens and Antonio Maldonado, Lawrence John Dahm, M.D., Bradley Wayne Drachenburg, Joe "Ezzie" Cortez, Gilbert and Mario Pantoja, Detective Joe Michael Salinas, and Investigator Daniel Cortez. Quiroga neither testified nor called any witnesses to testify on his behalf.

### A. Ahrens and Maldonado's Testimony

Ahrens, an officer for the Harlingen Police Department, testified that he was on patrol at "The Strip" in Harlingen, Texas, on the night of the incident.[2] Ahrens was in his patrol car sitting in traffic approximately 150 feet from the intersection of Tyler Street and

---

[1] The indictment also contained an enhancement paragraph which stated that Quiroga had previously been convicted of felony possession of marihuana on February 8, 1994, and felony aggravated assault on January 31, 1996. The State subsequently dismissed all of the charges alleged in the indictment except for the two counts of murder, one count of tampering with physical evidence, and the enhancement paragraphs.

[2] Ahrens identified "The Strip" as a place in Harlingen where "people drive their vehicles up and down . . . basically east on Tyler and then they turn around and go back west on Harrison."

2

F Street when he observed an individual later identified as Eleazar approach a car. Ahrens noted that as Eleazar approached the car, it appeared as if Eleazar was wanting to fight someone. Ahrens stated that he thought he saw Eleazar throw something at the car, and shortly thereafter, he heard gunshots. Ahrens saw puffs of smoke emanating from a silver Saturn car, and he saw Eleazar fall to the ground. Ahrens testified that he did not see a gun, knife, or any other weapon in Eleazar's hands when Eleazar approached the silver Saturn. As he maneuvered his patrol car to get closer to the scene of the incident, Ahrens called for backup on his radio and observed Gilbert and Jose Luis "Slim" Perez drag Eleazar's body out of the street. Upon arriving at the scene, Ahrens secured the area and loaded Eleazar's body in his patrol car to be immediately taken to the hospital. In securing the area, Ahrens did not see any weapons strewn about or removed from the scene. Shortly after arriving at the hospital, Eleazar was pronounced dead.

Maldonado, also an officer with the Harlingen Police Department, was patrolling a nearby street when he heard a loud pop that sounded like a gunshot. He subsequently heard Ahrens's call for backup and made his way to the scene of the incident. Upon arriving at the scene, Maldonado began to question witnesses about what had happened. He discovered that most witnesses were uncooperative; however, some people identified the gunman's car as a "gold or silver vehicle, and it took off eastbound on Tyler." After speaking with witnesses, Maldonado began to investigate the scene. He noticed that there were rocks that were four inches in diameter at the scene; however, he did not see any handguns, knives, or bricks in the street.

**B. Dr. Dahm's Testimony**

Dr. Dahm conducted the autopsy on Eleazar's body and concluded that Eleazar

3

died from a gunshot wound to the left chest. A routine toxicology exam revealed that Eleazar was intoxicated and had trace amounts of marihuana in his blood on the night of the incident.

## C. Drachenburg's Testimony

Drachenburg testified that he and his friends were present at "The Strip," near the intersection of Tyler and F Streets, on the night of the incident. He stated that he heard an initial "bang" followed by "two or three more bangs" and then he saw Eleazar fall to the ground. When asked about the series of "bangs" heard, Drachenburg testified that the first "bang" sounded like a rock hitting a car and the subsequent "bangs" sounded like gunshots; however, he admitted that he did not see a rock thrown or shots fired. After observing Eleazar fall to the ground, Drachenburg noticed a gray Saturn with chrome wheels take off through a red light. Drachenburg believed that the driver of the Saturn was trying to quickly flee the scene. Drachenburg added that he was not under the influence of drugs or alcohol on the night in question.

## D. Ezzie's Testimony

Ezzie stated that he was one of Eleazar's good friends and that they saw each other "[p]retty much every day." Ezzie testified that he was at "The Strip" on the night of the incident and that he observed Eleazar get shot. While all of the cars in the street were stopped because of a red light, Eleazar was called over to the silver car and was shot by the driver. Ezzie recalled that: (1) when Eleazar approached the silver car, Eleazar was holding a beer in his hand; and (2) he did not remember seeing Eleazar throw anything at the silver car. Ezzie later admitted that he and Eleazar were members of the Westside Aquas street gang. Ezzie denied seeing Eleazar brandish any weapons or say any fighting

4

words to the driver of the silver car in the moments leading up to the killing.

**E. Gilbert and Mario's Testimony**

Gilbert testified that Eleazar was his older brother and that he was at "The Strip" with Mario and Eleazar on the night in question. Gilbert recalled seeing Eleazar being shot, and he denied that Eleazar threw anything at the silver car. Instead, Gilbert remembered that Eleazar was holding a beer as he approached the silver car. Gilbert also denied that Eleazar pulled out a firearm or a knife at any time that evening. Gilbert testified that he: (1) heard two gunshots fired; (2) saw Eleazar make a throwing motion only after Quiroga had shot him; and (3) identified the shooter's silver car. Gilbert also referenced an incident at a local car wash where another Westside gang member, Christian Yanez, tried to run Quiroga over with a car. Gilbert believed that the shooter was Quiroga and that he was exacting revenge against Eleazar even though Eleazar was allegedly not involved in the car wash incident.[3] Gilbert stated that he saw the silver car pass by several times prior to the shooting.

Mario stated that Eleazar was his big brother and his best friend. Mario noted that he was a couple of steps away from Eleazar at the time of the shooting. Mario identified the shooter's car as a silver Saturn and was able to see the shooter's face. Mario testified that Eleazar did not throw anything at the car and that Eleazar only had a beer in his hand when he approached the car.[4] Mario heard two shots fired and saw the silver Saturn immediately flee the scene. Mario recalled a separate incident involving Eleazar, the silver

---

[3] Salinas testified, based on his own investigation, that Eleazar was not involved with the car wash incident.

[4] However, Investigator Cortez testified that Mario told him on the day after the incident that he saw Eleazar throw something at the silver car.

Saturn, and him. Approximately a week prior to the shooting, Eleazar and Mario were approached by two unidentified individuals bearing hammers. The two individuals drove a silver Saturn.[5] Eleazar and Mario fled from the scene. Mario identified the shooter as Quiroga, and when presented a photo lineup, Mario wrote the words, "He shot my brother," under Quiroga's photo.

On cross-examination, Mario was asked about a drawing he made shortly after the incident had occurred. In this drawing, Mario illustrated the crime scene, which showed that Eleazar had something in his hand at the time he was shot. At trial, Mario testifed that: (1) the object in Eleazar's hand at the time of the shooting was a beer; (2) the beer was under Eleazar's shirt; and (3) Eleazar was reaching for the beer when he was shot.

### F. Salinas's Testimony

Salinas, a detective with the Harlingen Police Department, testified that he was the lead detective in the investigation of Eleazar's death. Salinas stated that Quiroga drove a silver Saturn and that, based on his investigation, Quiroga shot Eleazar on the night in question. Salinas identified Quiroga in open court as the individual picked out by Mario from the photo lineup. Salinas obtained an arrest warrant for Quiroga and tried to locate him by using his last known addresses, but ultimately was unsuccessful. Quiroga was later apprehended by United States Border Patrol agents trying to illegally enter the United States from Mexico. Quiroga was transported to a Harlingen jail for questioning by Salinas who interrogated Quiroga and, after reading Quiroga his *Miranda* rights, obtained a

---

[5] Mario believed that the two individuals were around eighteen or nineteen years old. It was undisputed that Quiroga was an "older gentleman."

6

confession.[6]  *See generally Miranda v. Arizona*, 384 U.S. 436 (1966).

At trial, Salinas was asked several questions regarding the interrogation. Initially, Quiroga told Salinas that no brick had been thrown and that he was in Mexico on the night in question. Later, Quiroga admitted to being in a prison gang, the Texas Syndicate. Quiroga also admitted to threatening to kill several people in the past and that he immediately fled to Mexico after he shot Eleazar. Quiroga sold the handgun used to shoot Eleazar while he was in Mexico. Quiroga also made several contradictory statements to Salinas, including "I killed him because I was confused," "They messed with the wrong person," and "If someone would've come instead of that kid it wouldn't have been him you got me." Later in the interrogation, Quiroga contradicted his earlier statements by claiming that Eleazar had thrown a brick at his car. He did not state that Eleazar had a firearm or a knife in his possession. Salinas testified that, after questioning Quiroga, he believed that Quiroga had adequate time to determine what he was up against and did not believe that Quiroga acted in self-defense.

**G. Cortez's Testimony**

Cortez, a crime-scene investigator and evidence custodian for the Harlingen Police Department, testified that he recovered a pocket knife from the pocket of Eleazar's sweatshirt. Cortez stated that the pocket knife had a blade measuring one-and-a-half to two inches. He also found a disposable cigarette lighter in Eleazar's sweatshirt. On cross-examination, Cortez admitted that the pocket knife could have inflicted a fatal wound if it had been used.

---

[6] After asking Salinas about the interrogation of Quiroga, the State moved to admit a videotape and English translation of the interrogation. Both items were admitted without objection.

## II. ANALYSIS

## A. Self-Defense

In his first and second issues, Quiroga argues that the evidence adduced at trial is legally and factually insufficient to support the jury's rejection of his claim of self-defense.

### 1. Applicable Law

Self-defense is justified when a person reasonably believes that force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. TEX. PENAL CODE ANN. § 9.31(a) (Vernon Supp. 2008).

Furthermore, a person is justified in using deadly force against another:

> (1) if the actor would be justified in using force against the other under Section 9.31; and

> (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary;

>> (A) to protect the actor against the other's use or attempted use of unlawful deadly force; or

>> (B) to prevent the other's commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

*Id.* § 9.32(a) (Vernon Supp. 2008).

Once evidence is produced raising the issue of self-defense, the State bears the burden of persuasion to disprove the defense.[7] *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). The State's burden of persuasion does not require the production of

---

[7] It is axiomatic that the "'defendant has a right to an affirmative instruction on every defensive issue raised by the evidence whether the evidence is produced by the [S]tate or by the defense, whether it is strong or feeble, whether it is umimpeached or contradicted, or whether it is conflicting.'" *Saxton v. State*, 804 S.W.2d 910, 913 n. 9 (Tex. Crim. App. 1991) (quoting *Ramos v. State*, 478 S.W.2d 102, 104 (Tex. Crim. App. 1972)).

evidence; it requires that the State prove its case beyond a reasonable doubt. *Id.* Whether the defendant acted in self-defense is a fact issue to be determined by the jury. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991) (en banc). The jury is free to accept or reject any defensive evidence on the issue of self-defense. *Id.* at 914. A jury implicitly rejects a defensive theory when it finds the defendant guilty. *Zuliani*, 97 S.W.3d at 594.

### 2. Standard of Review

On appeal, when the defendant challenges the legal sufficiency of the evidence supporting the jury's rejection of his self-defense theory,

> we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against the appellant on the self-defense issue beyond a reasonable doubt.

*Saxton*, 804 S.W.2d at 914. A person commits the offense of murder if he "intentionally or knowingly causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1).

When a defendant challenges the factual sufficiency of the jury's rejection of a defense, we review all of the evidence in a neutral light and ask whether the State's evidence, taken alone, is too weak to support the finding and whether the proof of guilt, although adequate if taken alone, is against the great weight and preponderance of the evidence. *Zuliani*, 97 S.W.3d at 595.

### 3. Discussion

In the instant case, Quiroga admitted that he shot and killed Eleazar with his gun while in his car. After shooting Eleazar, Quiroga immediately ran a red light in order to quickly flee to Mexico. On appeal, Quiroga directs us to statements he made to Salinas

9

in the interrogation that Eleazar approached his car on the night in question with a brick in his hand and subsequently threw the brick at the car.[8] Because Eleazar allegedly threw a brick at Quiroga's car, Quiroga contends that he was justified in using deadly force.

Several witnesses testified that Eleazar did not throw anything at Quiroga's car and that he approached the car with only a beer in his hand. Ahrens testified that he thought he saw Eleazar throw something at Quiroga's car, and Drachenburg stated that he heard an object strike Quiroga's car. However, neither Ahrens nor Drachenburg saw precisely what, if anything, was thrown at Quiroga's car. Gilbert noted that Eleazar made a throwing motion only after Quiroga had fired a shot. Furthermore, Quiroga himself offered conflicting statements as to whether a brick had been thrown and noted that he thought the brick was a weapon and that the brick hurt his arm and leg.[9] The resolution of the conflicting testimony was within the province of the jury. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("This standard [the legal sufficiency standard] accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. . . . [W]e determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.").

In investigating the crime scene, law enforcement did not find any bricks; instead, they found a few rocks that were at most four inches in diameter, suggesting that Quiroga's

---

[8] On cross-examination, Ahrens stated that objects such as bricks could be considered deadly weapons.

[9] In his statements to Salinas, Quiroga was unsure if the object allegedly thrown was a brick or a rock.

use of deadly force was unreasonable. *See* TEX. PENAL CODE ANN. § 9.32(a)(2); *see also Chandler v. State*, No. 07-05-0401-CR, 2007 Tex. App. LEXIS 4527, at \*\*2-3, \*6 (Tex. App.–Amarillo May 31, 2007, pet. ref'd) (mem. op., not designated for publication) (affirming a murder conviction and rejecting a self-defense theory where the deceased threw a sandal at defendant's trailer and allegedly approached defendant "enraged"); *Hatcher v. State*, No. 05-00-00214-CR, 2002 Tex. App. LEXIS 25, at \*1, \*\*14-15 (Tex. App.–Dallas, Jan. 4, 2002, pet. dism'd) (mem. op., not designated for publication) (affirming a murder conviction and rejecting a self-defense theory where defendant shot the deceased after an altercation involving a group of men calling each other names, throwing bottles and rocks, and inviting each other to fight); *Cantu v. State*, No. 03-00-00082-CR, 2001 Tex. App. LEXIS 4385, at \*\*1-2, \*\*8-9 (Tex. App.–Austin June 29, 2001, pet. ref'd) (mem. op., not designated for publication) (affirming a murder conviction and rejecting a self-defense theory where defendant shot the deceased after two rival gangs exchanged insults and the deceased and his gang allegedly threw rocks and bottles at defendant's house). Although law enforcement later discovered that Eleazar had a small pocket knife in his possession on the night in question, no witnesses, including Quiroga, stated that Eleazar attempted to attack Quiroga with the pocket knife. Mario testified that: (1) he observed Quiroga drive by Eleazar and his friends several times as if to scope out the scene; and (2) members of Eleazar's gang had previously tried to run Quiroga over at a local car wash and that Quiroga's killing of Eleazar was motivated by revenge.

Based on the evidence adduced at trial, we conclude that it was not irrational for the jury to convict Quiroga of murder and reject his self-defense theory. *See Saxton*, 804 S.W.2d at 914.

11

The jury's decision to reject Quiroga's claim of self-defense ultimately hinged upon the credibility of the witnesses and the evidence, including Quiroga's statements to Salinas. *See Miller v. State*, 177 S.W.3d 177, 183 (Tex. App.–Houston [1st Dist.] 2005, pet. ref'd). "Unless the available record clearly reveals a different result is appropriate . . . [we] must defer to the jury's determination concerning what weight to give contradictory testimonial evidence because resolution often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson v. State*, 23 S.W.3d 1, 8 (Tex. Crim. App. 2000). Therefore, after reviewing all of the evidence in a neutral light, we conclude that the State's evidence, taken alone, is not too weak to support the jury's rejection of Quiroga's self-defense claim. *See Zuliani*, 97 S.W.3d at 594-95. Furthermore, we cannot say that the verdict was clearly wrong or manifestly unjust. *See id.* at 595. Accordingly, we conclude that the evidence is legally and factually sufficient to support the jury's rejection of Quiroga's claim of self-defense. We overrule Quiroga's first two issues.

## B. Tampering With Physical Evidence

By his third and fourth issues, Quiroga contends that the evidence supporting his conviction for tampering with evidence is legally and factually insufficient. In particular, Quiroga asserts that the State failed to establish that he was aware that an investigation was in progress when he disposed of the firearm used to kill Eleazar. Quiroga further asserts that his disposal of the firearm did not impede the investigation regarding Eleazar's death. The State argues that the evidence supporting Quiroga's conviction for tampering with evidence is legally and factually sufficient because Quiroga admitted to police that "he knew[:] (1) he had shot someone; (2) that [the] gun was used in the shooting; (3) that the

gun could be used to tie him to the shooting[;] and (4) this was why he sold it."

**1. Applicable Law**

A person commits the offense of tampering with physical evidence if he: (1) knows that an investigation or official proceeding is pending or in progress; (2) alters, destroys, or conceals any record, document, or thing, and; (3) intends to impair its verity, legibility, or availability as evidence in the investigation or official proceeding. TEX. PENAL CODE ANN. § 37.09(a)(1). The three elements of section 37.09(a)(1) of the penal code include "'two different culpable mental states'—knowledge and intent." *Williams v. State*, 270 S.W.3d 140, 142 (Tex. Crim. App. 2008) (quoting *Stewart v. State*, 240 S.W.3d 872, 874 (Tex. Crim. App. 2007)). "The statute requires the knowledge of an investigation and the intent to impair a thing's availability as evidence." *Id.* "A person acts knowingly, or with knowledge, with respect . . . to circumstances surrounding his conduct when he is aware . . . that the circumstances exist." TEX. PENAL CODE ANN. § 6.03(b) (Vernon 2003). "A person acts intentionally, or with intent, with respect . . . to a result of his conduct when it is his conscious objective or desire to . . . cause the result." *Id.* § 6.03(a).

**2. Standard of Review**

In a legal sufficiency review, we view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Watson v. State*, 204 S.W.3d 404, 414-17 (Tex. Crim. App. 2006). We do not reevaluate the weight and credibility of the evidence, whether circumstantial or direct, nor do we substitute our own judgment for that of the trier of fact. *Mosley v. State*, 141 S.W.3d 816, 821 (Tex. App.–Texarkana 2004, pet. ref'd); *Beckham*, 29 S.W.3d at 151.

13

Instead, we consider whether the jury reached a rational decision. *Beckham*, 29 S.W.3d at 151.

Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994); *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993); *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987)). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor; circumstantial evidence alone can be sufficient to establish guilt. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). On appeal, both circumstantial and direct evidence cases are examined using the same standard of review. *Id.*

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Neal v. State*, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008); *Watson*, 204 S.W.3d at 414. We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact finder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact finder's determination is manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); *Watson*, 204 S.W.3d at 414-15, 417. To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

We measure the sufficiency of the evidence by the elements of the offense as

defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). "Such a charge would accurately set out the law, would be authorized by the indictment, and would not unnecessarily increase the State's burden of proof." *Malik*, 953 S.W.2d at 240.

### 3. Discussion

On appeal, Quiroga argues that the State failed to present evidence demonstrating that: (1) he knew of an ongoing investigation into the killing of Eleazar when he sold the gun used in the shooting; and (2) the sale of the gun somehow impeded the investigation. The evidence established that Quiroga fled to Mexico immediately after shooting Eleazar. While there, Quiroga secured a buyer for the gun used to kill Eleazar. In statements made to Salinas, Quiroga noted that he sold the gun in Mexico "[s]o that someone here doesn't kill someone and then put the blame on me . . . it's a big problem if it happens." However, Quiroga also stated that after shooting Eleazar he "just got [his] things and went. No one knew anything about what . . . was happening. My family didn't know anything." Salinas testified that Quiroga's sale of the gun used to shoot Eleazar impeded his investigation because he was unable to match the bullets found at the scene with the gun.

The indictment in the instant case alleged the following: "knowing that an **investigation** was **in progress**, to wit: **investigation of ELEAZAR PANTOJA's death**, [Quiroga] intentionally or knowingly **conceal**[ed] **a weapon**, to wit: **a firearm**, with intent to impair its **availability** as evidence in the **investigation**." (Emphasis in original.) *See* TEX. PENAL CODE ANN. § 37.09(a)(1).

The State suggests that the jury was rational in inferring that Quiroga was aware of

15

an investigation that was "in progress" based on his immediate flight to Mexico and the sale of the gun.  We agree.

Proof of knowledge or intent is an inference that may be drawn by the fact finder both from direct evidence and from evidence of the circumstances surrounding the act. *Guevara*, 152 S.W.3d at 50; *Wolfe v. State*, 917 S.W.2d 270, 275 (Tex. Crim. App. 1996) (stating that  the trier of fact can infer knowledge from all the surrounding circumstances). Therefore, a jury can infer knowledge or intent from the acts, conduct, and remarks of the accused and from the surrounding circumstances.  *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991); *LaPoint v. State*, 750 S.W.2d 180, 182 (Tex. Crim. App. 1986).  Although the State did not produce evidence clearly demonstrating Quiroga's knowledge as to the status of the investigation into Eleazar's death, we find that a rational jury could have concluded that Quiroga fled to Mexico and immediately sold the gun because he knew that an investigation into Eleazar's death was "in progress" and that the State's case against Quiroga would have been augmented by the finding of the gun.  *See Guevara*, 152 S.W.3d at 50; *Wolfe*, 917 S.W.2d at 275; *see also Hernandez*, 819 S.W.2d at 810; *LaPoint*, 750 S.W.2d at 182.  In addition, a rational jury could have found that Quiroga's sale of the gun in Mexico impeded the investigation into Eleazar's killing.  *See* TEX. PENAL CODE ANN. § 37.09(a)(1); *see also Beckham*, 29 S.W.3d at 151.

Therefore, in viewing the evidence in the light most favorable to the verdict, we conclude that the evidence supporting Quiroga's conviction for tampering with physical evidence is legally sufficient.  *See Jackson*, 443 U.S. at 318-19; *Watson*, 204 S.W.3d at 414-17.  Furthermore, in viewing the evidence in a neutral light, we cannot say that the jury's verdict is clearly wrong or manifestly unjust.  *See Neal*, 256 S.W.3d at 275; *Watson*,

16

204 S.W.3d at 414.  We therefore hold that the evidence is factually sufficient.  *See Lancon*, 253 S.W.3d at 704.  Accordingly, we overrule Quiroga's third and fourth issues.

### III. Conclusion

Based on the foregoing, we affirm the trial court's judgment.

—

DORI CONTRERAS GARZA,
Justice

Do not publish.
Tex. R. App. P. 47.2(b).
Memorandum Opinion delivered and
filed this the 13th day of August, 2009.