NO. 07-10-0051-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

JULY 22, 2011

---

JOSE LUIS RODRIGUEZ, APPELLANT

v.

THE STATE OF TEXAS, APPELLEE

---

FROM THE 181ST DISTRICT COURT OF RANDALL COUNTY;

NO. 20,070-B; HONORABLE JOHN B. BOARD, JUDGE

---

Before CAMPBELL and PIRTLE, JJ. and BOYD, S.J.[1]

**MEMORANDUM OPINION**

Appellant, Jose Luis Rodriguez, was convicted by a jury of possession with intent to deliver a controlled substance, cocaine, in an amount of 400 grams or more[2] and assessed punishment of eighty years confinement and a $250,000 fine. In three issues,

---

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. § 75.002(a)(1) (West 2005).

[2]*See* Tex. Health & Safety Code Ann. § 481.112 (a), (f) (West 2010).

Appellant asserts (1) the evidence in support of his conviction is legally and (2) factually insufficient and (3) the trial court abused its discretion in denying Appellant's motion to dismiss for lack of speedy trial. We affirm.

**Background**

On July 24, 2008, a complaint was filed alleging that on or about September 21, 2007, Appellant intentionally and knowingly possessed, with intent to deliver, a controlled substance, to-wit: cocaine, in an amount by aggregate weight, including adulterants or dilutants, of 400 grams or more. Appellant was not arrested on the complaint at that time because he was already incarcerated.[3] A Randall County Grand Jury subsequently returned an indictment on September 10, 2008, alleging the same offense, and a capias was issued but not executed. Pursuant to a bench warrant issued November 21, 2008, Appellant was transferred from the Wheeler State Jail Unit in Hale County, to the Randall County Jail on December 5, 2008; however, he was not arraigned on the indictment until April 1, 2009. An attorney was appointed to represent him on May 22, 2009, and on June 4, 2009, Appellant moved to dismiss the State's cause for lack of a speedy trial. The trial court denied his motion on June 26, 2009, and a four day jury trial commenced on February 1, 2010.

During the trial, the State adduced evidence that, on the morning of September 21, 2007, the Narcotics Enforcement Team for the Randall County Sheriff's Office and SWAT Team for the Amarillo Police Department executed a "no knock" search warrant

---

[3]On February 11, 2008, Appellant was arrested for alleged violations of his felony probation in an unrelated cause. On March 26, 2008, his probation was revoked and he was sentenced to 18 months State Jail in Cause No. 53,302-A, in the 47th District Court, Potter County, Texas.

at 6700 Hollywood Road, Amarillo, Texas (house).  While evidence recovered at the scene indicated that the house had been occupied by at least three persons: Appellant, Sam Jalomo, Jr., and Angel Gutierrez; Jalomo was the only person present when the warrant was executed.  When the police entered, Jalomo was located in the southeast bedroom.[4]  As officers searched the house, they found evidence of a drug packaging and sales operation in nearly every room.  In the attic, officers found four kilograms of cocaine packaged as compressed bricks in a blue gym bag.  In the laundry room, they found a black duffle bag containing marijuana residue, and, in the living room, a magazine for a semi-automatic rifle and duct tape.[5]  On the kitchen counter was a heat sealing machine with a roll of heat seal packages.[6]  On a roll of heat seal packages were the fingerprints of Appellant, Marybell Delarossa (Appellant's girlfriend) and Kathy Okechukwu (Jalomo's girlfriend).

In the southeast bedroom, or Jalomo's bedroom, officers found $1400 in cash, $930 in Jalomo's shirt pocket and $470 on the counter in the bathroom.  More than two grams of cocaine were scraped from the bathroom counter and forty-one plastic Ziploc baggies individually filled with cocaine totaling 1.15 kilograms were found in a shoebox underneath the lavatory.  The officers also found a black ceramic plate encrusted with

[4]At trial, Gutierrez testified he lived at 6700 Hollywood Road at the time of the search and he stayed in the northwest bedroom while Jalomo stayed in the southeast bedroom and Appellant stayed in the northeast bedroom.  Gutierrez also testified that although Jalomo paid the rent, that neither Jalomo nor Appellant were employed.

[5]Douglas Herrington, APD SWAT team member, testified that the roll of duct tape in the living room matched packaging materials used on the unopened cocaine bricks in the attic and packaging material on opened cocaine bricks throughout the house.

[6]Gutierrez also testified that the heat sealing machine was used to package money obtained from selling drugs prior to the money being delivered to Mexico.

cocaine containing a spoon with Appellant's and Jalomo's fingerprints on the bottom of the plate.[7] There was also a plastic bag containing two boxes of baking soda and three digital scales covered with a white residue.[8] Underneath Jalomo's bed was a Norvinco SKS semi-automatic rifle with a magazine.[9] Officers also found a travel document confirming a six-day trip to Las Vegas, Nevada, for Jalomo and Okechukwu, including hotel accommodations costing $1,297.50.[10]

In the northwest, or Gutierrez's bedroom, the officers found an address book, 9 millimeter handgun ammunition, marijuana grinder, marijuana and two bundles of plastic Ziploc baggies.[11] The officers also found airplane ticket stubs naming Appellant and his girlfriend, Delarossa. In the bottom of Gutierrez's closet, the officers found a large black plastic garbage bag that contained a second bag containing packaging materials used to transport drugs, i.e., five to ten used packages for cocaine bricks made using cardboard, plastic with heat seals and tape. Some of the items had white powder on them. Appellant's fingerprints were found on a baking soda container in the second bag.

---

[7]Gutierrez testified that he used his hands or a spoon to process or cut the cocaine in Jalomo's bedroom using extenders such as baking soda on a plate similar to the plate encrusted with cocaine.

[8]Christopher Mayes, undercover narcotics officer, and Tommy Russell, APD narcotics agent, testified that digital scales were commonly used by narcotics dealers to measure quantities of drugs prior to resale.

[9]Gutierrez testified the rifle belonged to Jalomo and was kept for protection.

[10]Gutierrez testified that, shortly prior to the search, Appellant, Jalomo and their girlfriends traveled together to Las Vegas, Nevada.

[11]Christopher Mayes, undercover narcotics officer, testified that Ziploc and sandwich baggies were commonly found in houses utilized by narcotics dealers. He indicated the plastic baggies were normally used to package drugs for resale.

4

In the northeast, or Appellant's, bedroom,[12] the officers found a bottle of inositol on the bathroom counter.[13] In the medicine cabinet area, officers found a plastic container holding Q-Tips, little plastic baggies and a set of digital scales. White powder was found in the bottom of the container and on the digital scales. Appellant's fingerprints were on the bottom of the plastic container. The officers also found court documents signed by Appellant, an envelope postmarked August 13, 2007, addressed to Appellant in Canyon, Texas, and two airline baggage claim stubs naming Appellant and Delarossa.

At trial, Gutierrez testified that he, Appellant and Jalomo "go way back" and "grew up together in Dumas," Texas. According to Gutierrez, Appellant "knew what was going -- he knew what my homeboy [Jalomo], was doing," but "didn't have no part in it." Gutierrez testified that Jalomo and Appellant had been living at the house for several months before he moved in. He further testified that five bricks of cocaine were delivered the night before the search. He and Jalomo cut one brick with baking soda on a plate in Jalomo's bedroom and measured out the cocaine into forty-one plastic baggies that were subsequently stored in a shoebox underneath Jalomo's lavatory.[14]

---

[12]Gutierrez testified that Appellant "had his stuff there," kept his clothes in his bedroom and slept there sometimes. He also testified that he, Jalomo and Appellant "pretty much kept [their] stuff in [their] own room(s)."

[13]Brandon Conrad, manager of the Texas Department of Public Safety Crime Laboratory in Amarillo, Texas, testified that cocaine was commonly cut or diluted using baking soda, inositol, benzocaine and lidocaine.

[14]He testified that each baggie was intended to contain an ounce or 28 to 30 grams of cocaine after being weighed on digital scales. He estimated one ounce of cocaine was worth $500 to $600 on the street.

He further testified Appellant did not know five kilograms of cocaine had been delivered to the house the night before the search.

After leaving the house to pick up his girlfriend the day of the search, Gutierrez observed police officers descending on the house and immediately called Appellant and "told him that the cops had hit the house that they were staying at." He did not call anyone else. Thereafter, he went to an apartment where Appellant's girlfriend stayed and picked him up. They then attempted to hide Jalomo's red BMW because they knew authorities would seize the vehicle after the search. Of the three residents, Jalomo was the only one arrested that day. Gutierrez and Appellant were subsequently arrested pursuant to warrants issued in conjunction with the filing of criminal charges.[15]

At the trial's conclusion, the jury convicted Appellant, sentenced him to eighty years confinement and fined him $250,000. This appeal followed.

**Discussion**

In his first and second issues, Appellant contends the evidence is legally and factually insufficient to sustain his conviction for the knowing or intentional possession of the amount of cocaine alleged. He also asserts by a third issue that the trial court abused its discretion by denying his motion to dismiss for lack of a speedy trial.

---

[15]Gutierrez ultimately pled guilty and was sentenced to 25 years confinement.

## I.    Sufficiency of the Evidence

### A.    Standard of Review

Since Appellant's brief was filed, the Texas Court of Criminal Appeals has held that the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense the State is required to prove beyond a reasonable doubt is the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 33 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See Brooks v. State,* 323 S.W.3d 893, 912 (Tex.Crim.App. 2010).[16]    Under that standard, in assessing the sufficiency of the evidence to support a criminal conviction, this Court considers all the evidence in the light most favorable to the verdict and determines whether, based on that evidence and reasonable inferences to be drawn therefrom, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson,* 443 U.S. at 319; *Brooks,* 323 S.W.3d at 912.[17]    This standard gives full play to the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw

---

[16]Judge Hervey delivered the opinion in *Brooks*, joined by Judges Keller, Keasler and Cochran; and, Judge Cochran delivered a concurring opinion, joined by Judge Womack.  Although we are not bound by a decision of four judges, *Pearson v. State,* 994 S.W.2d 176, 177 n.3 (Tex.Crim.App. 1999), we read the combined opinions of Judges Hervey and Cochran in *Brooks* as abandoning factual sufficiency as an evidentiary sufficiency standard of review distinct from legal sufficiency.

[17]The previously-applied factual sufficiency standard considers whether the evidence supporting guilt, though legally sufficient, is so weak that the jury's verdict seems clearly wrong and manifestly unjust, or evidence contrary to the verdict is such that the jury's verdict is against the great weight and preponderance of the evidence.  *Grotti v. State*, 273 S.W.3d 283 (Tex.Crim.App. 2008); *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex.Crim.App. 2006).  Under that standard, the ultimate question is whether, considering all the evidence in a neutral light, the jury was rationally justified in finding guilt beyond a reasonable doubt.  *Grotti,* 273 S.W.3d at 283.  Even had we applied such a standard of review of the evidence, we could not sustain Appellant's contention.  From our review of the entire record, the finding of Appellant's guilt was neither clearly wrong and manifestly unjust nor against the great weight and preponderance of the evidence.

7

reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. *See Hooper v. State*, 214 S.W.3d 9, 15 (Tex.Crim.App. 2007).

Further, the trier of fact is the sole judge of the weight of the evidence and credibility of the witnesses; Tex. Code Crim. Proc. art. 38.04 (West 1979); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex.Crim.App. 2000), and we may not re-evaluate the weight and credibility determinations made by the fact-finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App. 1999). Thus, we resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex.Crim.App. 2000).

In addition, each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts are sufficient to support the conviction. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004) (citing *Alexander v. State*, 740 S.W.2d 749, 758 (Tex.Crim.App. 1987)). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper,* 214 S.W.3d at 13. Accordingly, we will affirm the judgment of the trial court if the evidence is sufficient to prove Appellant's guilt under any theory authorized in the jury charge. *See Fuller v. State*, 827 S.W.2d 919, 931 (Tex.Crim.App. 1992) *cert. denied*, 509 U.S. 922, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993) ("It is well-settled that when a general verdict is

returned and evidence is sufficient to support a finding of guilt under any of the paragraph allegations submitted the verdict will be upheld.")[18]

## B. Law of the Parties -- Possession of a Controlled Substance

To establish unlawful possession of a controlled substance, the State must prove (1) that the defendant exercised care, custody, control, or management over the contraband and (2) that the defendant knew that what was possessed was contraband. *Salazar v. State*, 95 S.W.3d 501, 504 (Tex.App.--Houston [1st Dist.] 2002, pet. ref'd). In this case, however, the jury was authorized to find Appellant guilty under the law of parties.[19] Thus, to prove Appellant was criminally responsible as a party, the State was required to prove that another person was guilty of the charged offense; *see Torres v. State*, 233 S.W.3d 26, 30 n.2 (Tex.App.--Houston [1st Dist.] 2007, no pet.), and Appellant, "acting with intent to promote or assist the commission of the offense," "solicited, encouraged, directed, aided, or attempted to aid the other person to commit

---

[18]The jury in this case returned a general verdict finding Appellant guilty of unlawful possession of a controlled substance with intent to deliver as alleged in the indictment.

[19]Paragraph 9 of the charge stated, in pertinent part, as follows:

> A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. Each party to an offense may be charged with the commission of the offense.

> A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

> \* \* \*

> In determining whether the defendant participated in an offense as a party, the jury may examine the events before, during, and after commission of the offense and may rely on any actions by the defendant that show an understanding and common design to commit the offense.

9

the offense." Tex. Penal Code Ann. § 7.02(a)(2) (West 2011). *See Torres,* 233 S.W.3d at 30 n.2.

Gutierrez admitted while testifying at trial to knowingly having care, custody, control, or management over the cocaine located in the house where Appellant was also staying. Furthermore, Jalomo was in actual possession of the cocaine at the time the search warrant was executed. Therefore, the issue is whether Appellant acted with intent to assist either Gutierrez's or Jalomo's commission of the offense by aiding their possession, with intent to deliver, of the cocaine recovered from the house. *See Salazar*, 95 S.W.3d at 505. In our analysis of this issue, we "look at 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Guevara*, 152 S.W.3d at 49 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex.Crim.App. 1987)).

The State's evidence showed that Appellant was living in a house with persons he had known since childhood and knew that Jalomo and Gutierrez were involved in the packaging and resale of cocaine. Appellant and his girlfriend accompanied Jalomo and his girlfriend by airplane to Las Vegas for a six-day trip despite the fact that neither he nor Jalomo was gainfully employed. Throughout the house where Appellant had been living for months, there was clearly present empirical evidence that its inhabitants had been engaging in the packaging and resale of cocaine on a major scale. There were four kilograms of cocaine stored in the attic, a plastic garbage bag containing five to ten used containers for bricks of cocaine, at least four sets of digital scales (all covered with

10

a white powder residue), forty-one plastic baggies containing an ounce of cocaine each for resale, multiple boxes of plastic baggies used for resale of the cocaine and a semi-automatic rifle with two magazines for protection.

Specifically, in Appellant's room alone, there was a plastic container with Appellant's fingerprint that stored plastic baggies, a set of digital scales with white powder residue, a bottle containing a substance commonly used to cut cocaine, and an accumulation of white powder in the bottom of the plastic container. In his room, Appellant also stored personal items, clothing, toiletries, court documents, other legal documents and his airline baggage claim stub. In Jalomo's room, a black ceramic plate used to cut cocaine had Appellant's and Jalomo's fingerprints on its bottom and, in Gutierrez's room, Appellant's fingerprint was found on a box of baking soda in a plastic bag that also contained five to ten used containers for cocaine bricks. Appellant's airline ticket stubs were also found in Gutierrez's room. In the kitchen, Appellant's fingerprints were identified on a roll of plastic used to heat seal money from the sale of cocaine for transportation to Mexico. Further, when the police descended on the house to execute their search warrant, Gutierrez immediately called to warn Appellant and subsequently met Appellant to secrete Jalomo's BMW in an attempt to avoid its forfeiture. This evidence reasonably implies that Appellant was not only knowledgeable of the drug operation at the house but participated in every facet of the enterprise.

Based on the totality of the evidence, a jury could have reasonably concluded that Appellant was a participant in an ongoing criminal enterprise involving the possession of cocaine with intent to deliver and he knew he was assisting the offense.

11

Although Gutierrez testified that Appellant did not participate in the purchase of any cocaine, the jury's verdict indicates they chose to believe the State's evidence and the reasonable inferences that can be drawn from the entirety of the State's case to conclude that Appellant took affirmative steps to assist, aid, and promote a criminal enterprise involving Jalomo and Gutierrez.

Further, although Appellant may not have been present when the five kilograms of cocaine were delivered, "[t]he Penal Code does not require that the party actually participate in the commission of the offense to be criminally responsible." *Guevara*, 152 S.W.3d at 51. Neither does the Penal Code "require that a party to the crime be physically present at the commission of the offense." *Id.* (citing *Morrison v. State,* 608 S.W.2d 233, 234 (Tex.Crim.App. 1980)). Therefore, after examining all of the evidence in the case in a light most favorable to the verdict, we conclude that a rational jury could have found all the elements of an aiding theory of party responsibility to be proven beyond a reasonable doubt. Appellant's first two issues are overruled.

## II.  Speedy Trial

Appellant next asserts his right to a speedy trial was violated by an eighteen month delay between the time he was formally charged, July 24, 2008, and the date of his trial, February 1, 2010. He also asserts his defense was prejudiced because (1) he was without an attorney for more than five months after he had been transferred from the Wheeler State Jail Unit in Hale County, Texas, to the Randall County Jail in Amarillo, Texas, and (2) the delay in bringing the charges to trial precluded him from securing a material witness.

12

### A.    Standard of Review

In reviewing the trial court's ruling on Appellant's motion to dismiss for lack of speedy trial, we apply a bifurcated standard of review:  an abuse of discretion standard for factual components and a *de novo* standard for legal components.  *Harrison v. State*, 282 S.W.3d 718, 720 (Tex.App.--Amarillo 2009, no pet.) (citing *Cantu v. State*, 253 S.W.3d 273, 282 (Tex.Crim.App. 2008)).  While our review necessarily involves factual and legal conclusions, how these two interrelate "as a whole . . . is a purely legal question."  *Id.* (quoting *Cantu*, 253 S.W.3d at 282).  This is particularly so here where the facts are undisputed.

### B. *Barker* Analysis

Constitutional speedy-trial claims are analyzed on an *ad hoc* basis by weighing and then balancing the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).  These four factors are:  (1) length of delay, (2) reason for delay, (3) assertion of the right, and (4) prejudice to the accused.  *Cantu*, 253 S.W.3d at 280.  We consider the four factors together along with the relevant circumstances noting that no one factor possesses "talismanic qualities."  *Harrison*, 282 S.W.3d at 721 (quoting *Zamorano v. State*, 84 S.W.3d 643, 648 (Tex.Crim.App. 2002)).

While the State has the burden of justifying the length of the delay, the defendant has the burden of proving (1) the assertion of his right to a speedy trial and (2) the showing of prejudice.  *Id.* (citing *Ex parte McKenzie,* 491 S.W.2d 122, 123 (Tex.Crim.App. 1973)).  The defendant's burden of proof on the latter two factors varies

13

inversely with the State's degree of culpability for the delay, i.e., the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial. *Id.* (citing *Cantu,* 253 S.W.3d at 280-81).

### 1. Length of Delay

The *Barker* test is triggered by a delay that is unreasonable enough to be presumptively prejudicial. *Id.* (citing *Doggett v. United States*, 505 U.S. 647, 652 n.1, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992)). While there is no set time element that triggers a *Barker* analysis, the Court of Criminal Appeals has held that a delay of four months is insufficient while a seventeen-month delay is sufficient. *Cantu*, 253 S.W.3d at 281 (collected cases cited therein).

Here, more than twenty-eight months passed between the time of the offense and the time of trial and more than eighteen months passed between the time formal charges were filed and the time of trial. We find the length of delay factor weighs in favor of Appellant. Thus, we will consider the three remaining *Barker* factors.

### 2. Reason for the Delay

At the hearing on Appellant's speedy trial motion, both the State and defense counsel recognized that Appellant's case had simply "slipped through the cracks." A "neutral" justification such as an overcrowded docket or mere negligence "should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the

14

defendant." *Harrison,* 282 S.W.3d at 721 (quoting *Barker*, 407 U.S. at 531). *See Murphy v. State*, 280 S.W.3d 445, 453 (Tex.App.--Fort Worth 2009, pet. ref'd) (stating lack of explanation for the delay weighs against the State but not greatly when there is no evidence that the prosecutor purposefully engaged in dilatory tactics). Appellant offered no evidence that the State's delay was purposeful. Accordingly, given that (1) Appellant was not arrested on the date of the alleged offense, (2) he was already incarcerated for another offense at the time formal charges were filed, (3) he was bench warranted to Randall County prior to completion of his state jail sentence in order to stand trial, (4) he was accorded a jury trial within 10 months of being arraigned, and (5) there was no evidence of a purposeful delay, we find the second *Barker* factor weighs only slightly in favor of a finding of a speedy trial violation.

### 3. Timeliness of Asserted Speedy Trial Claim

The third factor is concerned with the timeliness of a defendant's assertion of his right to a speedy trial. *See Harrison,* 282 S.W.3d at 721 (citing *Barker*, 407 U.S. at 529). Although the defendant has no duty to bring himself to trial, he does have a responsibility to assert his right to a speedy trial. *Cantu*, 253 S.W.3d at 282. Nonetheless, filing for a dismissal before seeking a speedy trial generally weakens a speedy trial claim because it indicates a desire to have no trial instead of a speedy one. *Id.* at 283. When this occurs, the defendant should provide cogent reasons for this failure to seek speedy trial before dismissal. *Id.*

When Appellant learned of the charges pending against him in Randall County in July 2008, he was incarcerated at the Wheeler State Jail Unit. He subsequently applied

15

to be transferred to the custody of the Randall County Sheriff and, in December 2008, was transferred to the Randall County Jail. Four months passed before he was arraigned and requested an attorney. An attorney was appointed in May 2009, and Appellant filed his motion to dismiss for lack of a speedy trial in June 2009, approximately a month later.

Given the delay between Appellant's transfer to Randall County and his subsequent arraignment four months later, we cannot say that Appellant unreasonably delayed in asserting his right to a speedy trial. That said, however, Appellant provides no explanation why he failed to seek a speedy trial before dismissal. Accordingly, we find this factor weighs in favor of neither party.

### 4. Prejudice

Because pretrial delay is often both inevitable and wholly justifiable; *Cantu*, 253 S.W.3d at 385, the fourth *Barker* factor examines whether and to what extent the delay has prejudiced the defendant. *Barker,* 407 U.S. at 532. Prejudice "should be addressed in the light of the interests of the defendants which the speedy trial right was designed to protect." *Id.* There are three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. *Id.*

Appellant did not assert prejudice based upon oppressive pretrial incarceration or anxiety or concern. Rather, he asserts that, because of the delay, a potential witness was unavailable. To establish particularized prejudice based on an unavailable witness,

a defendant must present proof both of the efforts made to locate the witness and that the witness would have benefitted his defense. *Harrison*, 282 S.W.3d at 721. Appellant did neither.[20] Neither did Appellant present any evidence establishing he was prejudiced by being without an attorney during the four month period between when he was transferred to the Randall County Jail and his subsequent arraignment. Thus, he has failed to establish particularized prejudice due to any delay. This factor weighs against a finding of a speedy trial violation.

### E.     Weighing of *Barker* Factors

While we are troubled by the ten month delay between the execution of the original search warrant and the filing of formal charges, the eighteen month delay between the filing of charges and the time of trial, as well as the four month delay between Appellant's transfer to custody in the Randall County Jail and his subsequent arraignment, we are cognizant of the fact that he was already incarcerated for a previous crime during much of this time and he was represented by counsel from May 2008 until his trial. Further, prior to asserting his right to a speedy trial, he never requested a trial setting, and at the hearing on his motion, he failed to establish any particularized prejudice to his defense due to the delay, oppressive pretrial incarceration, anxiety or concern, or any cogent reason for his failure to seek a speedy trial before dismissal. Accordingly, having weighed the *Barke*r factors against the

---

[20]At trial, Appellant re-urged his motion to dismiss for lack of a speedy trial based on the unavailability of two different witnesses but similarly failed to present any evidence of particularized prejudice.

record, we find the trial court did not err in denying Appellant's motion to dismiss for a speedy trial violation.

## Conclusion

The trial court's judgment is affirmed.


Patrick A. Pirtle
Justice



Do not publish.